In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00243-CR


______________________________




MICAH LOYD STOTTS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 6th Judicial District Court


Lamar County, Texas


Trial Court No. 20787




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 Micah Loyd Stotts appeals his conviction by a jury of endangerment of a child, S.C.F., (1) the
small son of Deanna Pridemore (Stotts's girlfriend), with a deadly weapon (methamphetamine or
amphetamine), a conviction which resulted in the imposition of a sentence of ten years' confinement
and a fine of $10,000.00. 

 The offense with which Stotts was charged and convicted is a state-jail felony when a person
"intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in
conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or
physical or mental impairment." See Tex. Penal Code Ann. § 22.041(c) (Vernon Supp. 2006). The
finding of the use of a deadly weapon (methamphetamine) in the commission of the act caused this
to be classified as a third-degree felony, pursuant to Section 12.35(c)(1) of the Texas Penal Code. 
See Tex. Penal Code Ann. § 12.35(c)(1) (Vernon 2003). 

 Stotts raises three points of error: (1) that the trial court erred in its failure to properly
instruct the jury regarding the use of accomplice-witness testimony, (2) that the evidence is legally
insufficient to sustain the conviction, and (3) that the evidence was factually insufficient to sustain
the conviction. 

Testimony at Trial

 According to the testimony of Vickie Foster (S.C.F.'s paternal grandmother) and Linsey
Parson, on separate occasions in the weeks before the night upon which S.C.F. fell very ill, he had
been in the presence of Stotts before the child was delivered to them. Upon S.C.F.'s arrival in their
presence in each of these instances, he was lethargic and quite ill with coughing, nausea, and
diarrhea. Each time, after only a few hours away from Stotts and Pridemore, S.C.F. would recover
from his sickly state and commence play and other activities in which small children commonly
engage.

 S.C.F. had other circumstances of intermittent illnesses as described, these being continued
for well over a month. As a result of these recurrent bouts of illness, Pridemore and Foster took
S.C.F. to see Dr. Ed Clark, a pediatrician. Initially, Clark believed the symptoms were due to a virus
and had prescribed treatment for S.C.F. which would be consistent with that diagnosis. However,
given the extended periods of time from which S.C.F. suffered from the symptoms, in retrospect,
Clark no longer believed that the cause was viral. Clark stated that although the exhibited symptoms
were similar to those which would be found in a child suffering from shaken baby syndrome, a
diagnosis such as that would not explain the intermittent nature of S.C.F.'s symptoms. Although
expressing that he had not studied the impact which methamphetamine would have on a child, Clark
posited that methamphetamine poisoning might have produced the symptoms suffered by S.C.F.

 On July 27, 2004, Stotts took S.C.F. alone with him in his pickup truck from Sumner toward
Sulphur Springs. Stotts stopped at a rest area park in Lamar County because S.C.F. had become
nauseated and was vomiting. Resuming, further down the road, S.C.F. suffered a seizure and
stopped breathing; Stotts administered CPR, revived S.C.F.'s breathing, and took him to Hopkins
County Memorial Hospital. From the Hopkins County Memorial Hospital, S.C.F. was airlifted to
Children's Hospital in Dallas, where he was treated by Dr. Matthew Cox, another pediatrician. Cox
testified that x-rays revealed skull damage which would indicate that S.C.F. could have suffered 
from shaken baby syndrome. Cox's initial belief was that S.C.F.'s lethargy and other symptoms were
due to head trauma as classic shaken baby syndrome. However, after learning that the child had
suffered the symptoms intermittently over a rather extended period of time, that the symptoms would
wax and wane, and that after S.C.F. began to reside with his grandparents, the Fosters, the symptoms
disappeared entirely, the suggested causal connection between the head injury and the symptoms the
child suffered was dismissed by him. Therefore, looking for other causes for the symptoms, Dr. Cox
took hair samples from S.C.F. and discovered from hair follicle testing that S.C.F. had recently been
exposed to methamphetamine or amphetamine; other evidence of S.C.F.'s exposure to
methamphetamine was the poor condition of his teeth, the child suffering a condition which is often
called "meth mouth." Cox concluded that the source of S.C.F.'s symptoms was the effect of
methamphetamine in his body and that the impact of methamphetamine or amphetamine on a child
can be (and sometimes is) deadly.

 In an interview with Travis Rhodes (an investigator with the Lamar County Sheriff's Office),
Stotts related that S.C.F. had exhibited the lethargy, nausea, and vomiting for three or four weeks
before the night he had the seizure and ceased breathing. Although Stotts admitted to regular use
of methamphetamine two to four times per day during this same period of time, he denied doing so
in the presence of S.C.F. Stotts also indicated to Rhodes that he kept his drugs in places that S.C.F.
would not have access to them.

 Billy Booker, a deputy with the Choctaw County, Oklahoma, Sheriff's Office, testified that
on October 28, 2004, he had stopped Stotts while Stotts was driving his pickup truck in Choctaw
County and had discovered a one-gallon plastic bag under the back seat of the vehicle, close to the
position in which a child's car seat would be expected to sit. Also located in the vehicle were about
four ounces of high-grade methamphetamine in the bag, a glass pipe for smoking methamphetamine,
and spoons and scales commonly used for measuring the substance. Booker also related that
methamphetamine can be absorbed through the skin, a circumstance which dictates that law
enforcement officials are advised to wear rubber gloves when handling it; due to that property of the
chemical, there is a danger to children in coming in contact with methamphetamine.

 Pridemore testified that she and S.C.F. had been living with Stotts at various places. All
during their relationship, she and Stotts had regularly used methamphetamine three or four times per
day, smoking the drug and inhaling its fumes. She had seen Stotts smoke methamphetamine on
many occasions while in his pickup truck and had done so herself. However, Pridemore never used
methamphetamine around S.C.F. She testified that she never saw Stotts use the drug in the presence
of S.C.F. and that he was "always big on he wouldn't do it around children." On occasion (as on the
night the child became so very ill), S.C.F. would be alone with Stotts. In one circumstance, Stotts
took S.C.F. to get a haircut; during that time of about forty-five minutes, S.C.F. had, once again,
become nauseated and had vomited. 

 Pridemore described the same lethargic behavior and nausea on the part of S.C.F. that Parson
and Foster had portrayed in their testimony, saying that these symptoms had lasted, to one degree
or another, for about a month prior to the final incident. On more than one occasion, S.C.F. would
be alone with Stotts and, thereafter, the symptoms would become more pronounced. She had taken
S.C.F. to Dr. Clark, who had diagnosed S.C.F. with a viral infection. 

 Pridemore testified that in October 2004, Stotts had told her that he was going to Arizona to
obtain drugs. Stotts left and while he was gone, S.C.F.'s symptoms diminished. When S.C.F. was
around Stotts, S.C.F.'s symptoms would begin again. On the night of the worst attack which S.C.F.
suffered, he was riding alone with Stotts in the pickup truck. 

 Pridemore had pled guilty to the same offense with which Stotts was charged.

Failure To Instruct Regarding Accomplice-Witness Testimony

 Stotts complains that the trial court erred in its failure to instruct the jury as to the
accomplice-witness testimony of Pridemore, although Stotts did not complain of that omission at
trial. Stotts further complains that the evidence corroborating the accomplice-witness testimony is
insufficient.

 The first inquiry which must be addressed is whether Pridemore is, indeed, an accomplice
witness about whose testimony the instruction must be given. A witness may be an accomplice
either as a matter of law or as a matter of fact; the evidence in a case determines what jury
instruction, if any, needs to be given. Gamez v. State, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987). 
If a witness is an accomplice as a matter of law, the trial court is required to provide an
accomplice-witness instruction to the jury. Id. Pridemore, having been indicted with Stotts for the
same offense (which arose from the same criminal conduct) and having pled guilty to that offense,
is an accomplice witness as a matter of law. See Paredes v. State, 129 S.W.3d 530, 536 (Tex. Crim.
App. 2004). Therefore, the accomplice-witness instruction was required to be given to the jury. 

 Recently, this Court addressed the failure to provide instructions as to accomplice-witness
testimony in Hall v. State, 161 S.W.3d 142 (Tex. App.--Texarkana 2005, pet. ref'd): 

 [I]f the appellant fails to object to the omission of the instruction, . . . he or she must
prove egregious harm to prevail on appeal. Solis v. State, 792 S.W.2d 95, 98 (Tex.
Crim. App. 1990). Egregious harm results from errors that deny the defendant a "fair
and impartial trial," "go to the very basis of the case," deprive the defendant of a
"valuable right," or "vitally affect his defensive theory." Almanza v. State, 686
S.W.2d 157, 172 (Tex. Crim. App. 1984) (op. on reh'g). "Egregious harm is a
difficult standard to prove and such a determination must be done on a case-by-case
basis." Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); see Batiste v.
State, 73 S.W.3d 402, 407 (Tex. App.--Dallas 2002, no pet.). In reviewing the trial
court's failure to instruct the jury on the accomplice witness rule, we examine the
record for evidence corroborating the accomplice witness testimony. If the evidence
"clearly warrants conviction independent of the accomplice testimony, the court's
failure to instruct on the law of accomplice testimony is not reversible error." Hall
v. State, 937 S.W.2d 580, 586 (Tex. App.--Texarkana 1996, pet. ref'd), citing Solis,
792 S.W.2d at 98.


Id. at 149.

 Clearly, the accomplice-witness instruction was appropriate, but it was neither requested nor 
given to the jury. Despite there having been no request for its inclusion, it was error to have omitted
the instruction. 

 An instruction concerning accomplice-witness testimony does not instruct a jury to disregard
the testimony of the accomplice; it merely informs the jury that it cannot use the accomplice-witness
testimony unless there is also some nonaccomplice evidence connecting the defendant to the offense.
Once it is determined that such nonaccomplice evidence exists, the purpose of the instruction is
fulfilled, and the instruction plays no further role in the fact-finder's decision-making. Therefore,
nonaccomplice evidence can render harmless the failure to submit an accomplice-witness instruction
by fulfilling the purpose that an accomplice-witness instruction is designed to serve. See, e.g.,
Bulington v. State, 179 S.W.3d 223, 231 (Tex. App.--Texarkana 2005, no pet.) (failure to submit
accomplice-witness instruction harmless).

 Under the egregious harm standard, the omission of an accomplice-witness instruction is
generally harmless unless the corroborating (nonaccomplice) evidence is "so unconvincing in fact
as to render the State's overall case for conviction clearly and significantly less persuasive." Herron
v. State, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (citing Saunders v. State, 817 S.W.2d 688, 692
(Tex. Crim. App. 1991)). 

 The evidence provided by Pridemore, the accomplice, was corroborated by other evidence. 
The narration concerning S.C.F.'s waxing and waning intermittent illness was provided through the
testimony of Foster, Parson, and Clark. The fact of daily drug use by Pridemore and Stotts was the
subject of Rhodes's testimony in his recount of his interview of Stotts. The primary unique bit of
independent testimony which Pridemore provided (i.e., that she never saw Stotts use the drug in the
presence of S.C.F. and that Stotts was "always big on he wouldn't do it around children") was more
exculpatory in nature than inculpatory. 

 However, Stotts has additionally challenged the sufficiency of this corroborating evidence. (2) 
The test for determining the sufficiency of the corroboration is to eliminate the accomplice-witness
testimony from consideration and then determine if there is any other incriminating evidence which
"tends to connect" the defendant with the crime. Meeks v. State, 135 S.W.3d 104, 112 (Tex.
App.--Texarkana 2004, pet. ref'd) (citing Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim.
App. 1997); Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988)). The nonaccomplice
evidence does not need to prove all the elements of the alleged offense. Meeks, 135 S.W.3d at 112
(citing Hernandez, 939 S.W.2d at 176; Underwood v. State, 967 S.W.2d 925, 928 (Tex.
App.--Beaumont 1998, pet. ref'd)).

 We conclude that Rhodes's testimony regarding his interview with Stotts (during which Stotts
himself admitted his frequent drug use), when combined with the circumstantial evidence from the
medical professionals and other sources about how S.C.F.'s physical symptoms would subside when
he was away from Stotts for an extended period of time, provided sufficient nonaccomplice evidence
to connect Stotts to S.C.F.'s methamphetamine or amphetamine exposure. The child was most ill
when Stotts was around (especially during times in which Stotts was S.C.F.'s sole care provider), and
the child got better when Stotts was not around the child. This evidence suggests Stotts was
somehow at least partly responsible for the child's exposure to the illegal drugs.

 Therefore, because the nonaccomplice evidence at least "tends to connect" Stotts to the crime,
and because there is evidence to corroborate the accomplice-witness testimony, we cannot say either
the corroborating evidence is insufficient, nor can we conclude Stotts suffered egregious harm as a
result of the trial court's failure to instruct the jury about accomplice-witness testimony. We overrule
this first point of error.

Legal and Factual Sufficiency

 Both the legal sufficiency standard and the factual sufficiency standard require the reviewing
court to consider all of the evidence. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App.
2006). The difference between the two standards is that a legal sufficiency review requires the
reviewing court to defer to the jury's credibility and weight determinations while a factual sufficiency
review permits the reviewing court to substitute its judgment for the jury's on these questions to a
very limited degree. Id.; see also Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (factual
sufficiency review requires reviewing court to afford "due deference" to a jury's determinations). 

 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson, 23 S.W.3d at 7.

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); Watson v. State, 204 S.W.3d
404, 414-15 (Tex. Crim. App. 2006); Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

 Reviewing the evidence which has already been discussed, we find that S.C.F. often and
sporadically exhibited the symptoms of lethargy, nausea, and vomiting. S.C.F. eventually suffered
a major seizure while in the company of Stotts and ceased breathing. On repeated occasions, S.C.F.
would develop symptoms after having been around Stotts and Pridemore and become symptom-free
a short period after being out of their presence. The physical symptoms suffered by S.C.F. are
among those which could be observed in a child who suffered exposure to methamphetamine. On
the other hand, S.C.F. was also shown to have suffered head trauma consistent with children having
shaken baby syndrome. The symptoms of shaken baby syndrome could mimic those of exposure to
methamphetamine, but it is very unlikely that those symptoms would be intermittent, as occurred
with S.C.F.

 Stotts admitted to Rhodes's regular and consistent use of methamphetamine, but steadfastly
maintained that he had not used the substance in the presence of S.C.F. Stotts had been arrested in
a neighboring state (but not in the presence of S.C.F.) with a sizeable stash of methamphetamine and
the use and marketing paraphernalia often associated with it. The methamphetamine was found in
the same pickup truck in which S.C.F. had often ridden with Stotts, and it was found in a location
in that truck where one would ordinarily secure an infant car seat. There was some evidence that
physical contact with methamphetamine can cause it to be absorbed through the skin. S.C.F.
exhibited what appeared to be "meth mouth" problems with his teeth, a characteristic of
methamphetamine exposure. The primary treating physician testified that it was his opinion that the
symptoms exhibited by S.C.F. were brought about by his exposure to methamphetamine. 

 There is, of course, no direct evidence that Stotts exposed S.C.F. to the methamphetamine
which he had been using. However, there was indirect or circumstantial evidence of that fact. 
Circumstantial evidence is the direct proof of a minor fact which, by logical inference, demonstrates
the fact to be proved. Hielscher v. State, 511 S.W.2d 305, 308 (Tex. Crim. App. 1974). There was
proof that S.C.F. often became ill when he had been around Stotts, but recovered when he was away
from Stotts. When S.C.F. suffered his symptoms the worst, it was when he was alone with Stotts
for the longest period of time. There was evidence from hair samples that S.C.F. had been exposed
to methamphetamine or amphetamine, either being a deadly substance to children, and that one of
these substances had entered his body. The opinion of the expert, Dr. Cox, attributed the symptoms
to drug exposure. There was no evidence of any other opportunity of exposure of the child to the
drug except through Stotts and Pridemore, who had also been charged. The jury could draw the
inference from the evidence it heard that Stotts exposed S.C.F. to methamphetamine.

 As noted, the offense with which Stotts was charged and convicted (Tex. Penal Code Ann.
§ 22.041 (Vernon Supp. 2006)) provides that the endangerment which is prohibited could be done
recklessly or with criminal negligence. Section 6.03(d) of the Texas Penal Code provides that: 

 A person acts with criminal negligence, or is criminally negligent, with respect to
circumstances surrounding his conduct or the result of his conduct when he ought to
be aware of a substantial and unjustifiable risk that the circumstances exist or the
result will occur. The risk must be of such a nature and degree that the failure to
perceive it constitutes a gross deviation from the standard of care that an ordinary
person would exercise under all the circumstances as viewed from the actor's
standpoint.


Tex. Penal Code Ann. § 6.03(d) (Vernon 2003).


 "Bodily injury" means "physical pain, illness, or any impairment of physical condition." Tex.
Penal Code Ann. § 1.07(a)(8) (Vernon Supp. 2006).

 Unfortunately, methamphetamine use has become widespread in our society and many of the
hazards associated with the exposure to methamphetamine have become common knowledge. A
jury could rationally find from this collection of facts that Stotts should have, but failed, to perceive
a substantial and unjustifiable risk of bodily injury to S.C.F. (who was often in his presence) from
his conduct of knowingly using methamphetamine in such a way that the child could be exposed to
it. A jury could also rationally find that his failure to perceive this substantial and unjustifiable risk
of bodily injury to S.C.F. arising from this conduct was clearly a gross deviation from the standard
of care that an ordinary person would exercise under the circumstances. These findings are sufficient
to meet the definition of "criminal negligence" in Section 6.03(d). See Tello v. State, 180 S.W.3d
150, 156 (Tex. Crim. App. 2005) The evidence is neither so weak nor so overbalanced by
controverting testimony to be insufficient--either legally or factually--to sustain the conviction.

 We affirm the judgment.



 Bailey C. Moseley

 Justice


Date Submitted: September 25, 2007

Date Decided: October 25, 2007


Do Not Publish
1. At the time of the incident, S.C.F. was about sixteen months old.
2. We note that Stotts has raised this issue as part of his first point of error concerning the trial
court's failure to give the accomplice-witness instruction. The issues of whether a trial court errs by
failing to give a jury instruction and whether the evidence is sufficient to corroborate an accomplice's
testimony are separate issues, which should be briefed separately. When an attorney writes a brief
that combines two or more issues that should be raised and addressed separately, that attorney risks
this Court overruling the combination issue for multifariousness. See, e.g., In re Guardianship of
Moon, 216 S.W.3d 506, 508 (Tex. App.--Texarkana 2007, no pet.); Woodall v. State, 216 S.W.3d
530, 533 n.3 (Tex. App.--Texarkana 2007, pet. filed); Dickey v. State, 189 S.W.3d 339, 341 (Tex.
App.--Texarkana 2006, no pet.); Newby v. State, 169 S.W.3d 413, 414 (Tex. App.--Texarkana
2005, no pet.).



ould have
been admitted in order to expose before the jury alleged perjured or erroneous testimony. Id. at 226. 
 Wilder also cites Walder v. United States, 347 U.S. 62 (1954). In Walder, a defendant who
had a previous charge of drug possession that had been dismissed, was later tried for additional drug
charges. On cross-examination, he denied that he had ever purchased, sold, or possessed any
narcotics. The State then presented evidence from officers who participated in the previous search
and the chemists who analyzed the heroin. The United States Supreme Court held such evidence
was proper impeachment.

 Harris v. New York, 401 U.S. 222 (1971), also involves a case in which a defendant testified
and was impeached by the State with evidence that would otherwise be inadmissible. The court
found that, even though the evidence would not have been admissible in the case-in-chief, it was
proper to allow impeachment and that no defendant has the privilege to commit perjury.

 Each of the cases cited by Wilder involve possible impeachment by questioning the defendant
or a complainant. However, in this case, Wilder did not attempt to impeach Dowdy through the use
of the testimony or further cross-examination of Dowdy. Wilder instead requested that the trial court
instruct the jury that Dowdy had committed perjury or had lied to the jury.

 It is improper for the judge to comment on the weight of the evidence. Tex. Code Crim.
Proc. Ann. art. 36.14 (Vernon Supp. 2003), art. 38.05 (Vernon 1979). This prohibition against
judicial comment forbids any discussion by the trial court in the jury's presence of evidence adduced
at trial which might suggest to the jury the court's personal estimation of the strength or credibility
of such evidence or which might tend to emphasize such evidence by repetition or recapitulation. 
Atkinson v. State, 923 S.W.2d 21, 24 (Tex. Crim. App. 1996); Hathorn v. State, 848 S.W.2d 101,
114 (Tex. Crim. App. 1992). 

 In this case, Wilder had the right to impeach Dowdy's testimony by further cross-examination, or by evidence from the witnesses who overheard such comments. However, the trial
court is prohibited from expressing any opinion as to the weight of the evidence or discussing the
facts. Tex. Code Crim. Proc. Ann. art. 36.14. A jury instruction from the court that a witness lied
or committed perjury would violate the prohibition against judicial comment and would express the
trial judge's personal estimation of the credibility of evidence. Atkinson, 923 S.W.2d at 24.

 We hold that the trial court did not err in refusing to instruct the jury that witness Dowdy
committed perjury or lied in their presence.

 The judgment of the trial court is affirmed.




 Jack Carter

 Justice




CONCURRING OPINION

 I agree that the trial court did not err in overruling Wilder's objection to the prosecutor's
comments during voir dire concerning the State's burden of proof. As pointed out by the majority,
it is proper in a criminal case for the attorneys to question members of the jury panel concerning their
understanding of the term "reasonable doubt." The rules governing what attorneys may say during
voir dire, however, are different from those governing what the trial court may say in its charge to
the jury. The majority reasoned that the prosecutor's statements were proper because the court's
charge to the jury stated, "[I]t is not required that the prosecution prove guilt beyond all possible
doubt. It is required that the prosecution's proof excludes all reasonable doubt concerning the
defendant's guilt." I disagree with this part of the majority's analysis for the reasons stated in my
concurring opinion in Fluellen. Fluellen v. State, 104 S.W.3d 152 (Tex. App.-Texarkana 2003, no
pet.). The majority in the instant case cautions the prosecutor against quantifying the concept of
beyond a reasonable doubt during voir dire, but apparently feels it is permissible for the trial court
to do so in its charge to the jury. I respectfully disagree.




 Donald R. Ross

 Justice

Date Submitted: June 25, 2003

Date Decided: June 26, 2003


Publish

 


1. The record does not reveal Mr. Roundtree's first name.
2. Statements by the prosecution, whether in final argument or voir dire examination, are
governed by the same rules. See Akin v. State, 981 S.W.2d 297 (Tex. App.-Texarkana 1998, no
pet.); Varughese v. State, 892 S.W.2d 186 (Tex. App.-Fort Worth 1994, pet. ref'd).