Mathew **VARUGHESE**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–93–169–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 27, 1994.

Rehearing Overruled March 1, 1995.

189

Kevin J. Clancy, Dallas, for appellant.

Jimmy E. Crouch, Paige Miller, and Kathleen A. Walsh, Asst. Dist. Attys., Denton, for appellee.

Before HILL, C.J., and HICKS, J.

OPINION

HICKS, Justice.

Mathew Varughese was convicted of murder, by a jury, upon his plea of not guilty. The jury assessed punishment at 75 years' confinement. In his appeal, Varughese raises ten points of error: (1) and (2) the trial court erred in allowing improper jury voir dire regarding appellant's failure to testify; (3), (5), and (6) the trial court erred in allowing improper jury argument regarding appellant's failure to testify, his race and nationality, and comparing him to Hitler; (7) the trial court erred in not allowing a probation charge on punishment; (4) through (10) appellant was deprived of his constitutional right to effective assistance of counsel. In a supplemental brief, filed at the request of the court, Varughese also raises an eleventh point of error claiming the trial court erred in overruling his motion for new trial.

We affirm.

Varughese was convicted of killing his wife, Aleyamma Mathew (Aleyamma), by pouring gasoline on her or in the vicinity of her bed where she may have been sleeping, and igniting the gas. She died of a combination of burning and smoke inhalation. Their three daughters, Dample, Dakxie, and Deepa were asleep upstairs when the fire started and Varughese awoke them by shouting. The daughters, and perhaps Varughese, attempted to put out the flames on their mother's immobile body, until the fire drove them back. Varughese and the daughters escaped with minor injuries.

Earlier in the evening, Varughese and his wife had quarreled because he was going back to their native land of India, for a visit, without taking her.

While the firefighters were putting out the fire, law enforcement and firefighting personnel interviewed Varughese and his daughters. Later, Varughese gave a recorded statement and lengthy deposition to his insurer.

In his first and second points of error, Varughese complains that, during voir dire, the prosecutor improperly commented on his

failure to testify. In the first instance, the State questioned:

> Is there anyone that would have a problem, say, for instance, in a murder case, if you did not hear from someone who actually pulled the trigger in the case?

Appellant objected that this was an improper comment on his right to remain silent, but the trial court overruled the objection. In point two, appellant complains about the State's continuing reference to a failure to testify, which occurred after his objection was overruled. In the questions quoted below, we have underlined the remarks to which appellant now objects.[1]

> Q. Mr. Johnson, for instance, if we had a murder case and we did not have an eyewitness, to see someone to say, I saw them pull the trigger. If we presented— would you have a problem? We present other evidence a different way to prove the case to you like I was talking about with the circumstantial evidence?
>
> A. No, not if they prove it.
>
> Q. I am sorry?
>
> A. Not if it was proven.
>
> Q. Not if it was proven to you beyond a reasonable doubt. *Would anyone have a problem if they didn't see the person that pulled the trigger? That—that's how the person was killed in a murder case. Sometimes, like in [a] murder case, just with any type of case, we don't have an eyewitness. We don't because a lot of times the only people that are present are the people, the person who is lying dead on the floor, wherever. They are lying dead and the person who actually killed them.*
>
> *And as the judge pointed out to you earlier, in criminal cases, a defendant has a right to plead the Fifth Amendment. They have the right to remain silent. And I think a lot of times jurors don't understand this. And I always want to make a point of it during jury selection, to point out that point is the fact the State, no matter how much Ms. Miller and I may want to call a defendant in a particular criminal case, we cannot force the defendant to testify. This is their right and*

*only their right to give up.* Everybody understand that?

> *I know we have tried cases, and every case I have asked jurors, what could we have done in this case to make it stronger. Now, we have had jurors say, well, I would have loved to have heard from the defendant. Well, I would love to have heard from the defendant, but I didn't have the power to call the defendant to testify.*

When we have that situation, what we may have to do in any criminal case is to recreate the crime from a scientific viewpoint. [Emphasis added.]

■ We conclude that, viewed in context, none of the remarks were objectionable comments on appellant's failure to testify or his right to remain silent. The State's evidence was circumstantial, so the State had a need to determine how the prospective jurors would view a circumstantial evidence case, and whether they could convict without direct evidence that Varughese set his wife on fire.

■ We further conclude the prosecutor's initial statement about the jury hearing "from someone who actually pulled the trigger" was probably a misstatement, as shown in follow-up argument. It appears the State was referring to hearing from a witness who saw the shooter actually pull the trigger. Even if the State truly wanted to know if the venire would have a problem not hearing from the actual shooter, this is not necessarily a reference to appellant's assertion of his right to silence. There is no shooter in this case and no showing the State knew Varughese would not testify.

Furthermore, the defense discussed the right to remain silent in its voir dire. The defense needed to know whether the panelists would hold against Varughese his failure to testify, and assume he would have testified if he were not guilty. Likewise, the State could question the jury on whether they could convict on circumstantial evidence. We overrule the first and second points of error.

---

1. Appellant failed to object to this argument at trial.

■ In his third point of error, Varughese maintains the State's argument, at the conclusion of the trial on guilt, improperly commented on his failure to testify. First, he complains about the underlined language in the following State's argument:

Mom had just recently been set on fire. What really happened that night at 1641 Palisades. *We don't really have anybody to give us the whole story.* But I am telling you that there is probably a little bit of truth in something that everybody has said. Probably, a little bit of truth in what the defendant said because the best lies are based on fact. Probably, a little bit of truth in what each of the children have said. [Emphasis added.]

It is clear the reference to "what the defendant said" alludes to his recorded statement and the extensive testimony he gave in a deposition by his insurance company. Circumstantial evidence showed appellant set his wife on fire, but the details were never precisely shown, due to lack of eyewitness testimony. For this reason, there was no error in this argument, which basically discusses the veracity of Varughese and his three daughters. We conclude this is not a comment on Varughese's failure to testify, as Varughese had given his whole story about the fire in the statement and deposition introduced in evidence.

Next, Varughese complains about the underlined language in this portion of the State's rebuttal argument:

That's the same thing as Patricia Eddings said. If you look at this, the clothing here, just to you and I it doesn't look like there is anything on it. The defendant wouldn't have been trying to hide anything. He's not some medical expert. He doesn't have the years and years and years of training that Patricia Eddings has to do her testing.

Could there have been a—more than one flash. *There is no evidence of that. There is no testimony to support that. The defense could have brought forth ten witnesses if they wanted to.* Who said that in this kind of fire there is a possibility that there could be more than one flash. You didn't hear one shred of evidence from this witness stand to state, that in this type of incident there would have been more than one flash. [Emphasis added.]

■ These comments appear to be in response to defensive argument. At trial, experts testified about a shirt with melted fibers which was found next to the burning house and discussed Varughese's singed nasal hairs when he arrived at the hospital and the location of the burns on his body. The experts concluded Varughese was in the bedroom at the time there was a "flash fire"— when the gas first ignited. Varughese testified in his deposition that he was out of the house when the fire began and this evidence contradicted his story. In argument, defense counsel stated,

Maybe there was another flash after Mr. Varughese came in the room. He even says, when he came in the room, there was a flash after he came inside, after the smoke started billowing out.

We conclude the prosecution did nothing more than answer the defense argument suggesting there could have been more than one flash fire, by responding that the defense could have called expert witnesses and could have queried the State's witnesses about that possibility. We find no error in this argument.

■ In his third claim of erroneous jury argument, Varughese complains about the following closing argument of the State:

No, we don't have an eyewitness. And every single one of you promised, I am not going to require that, Mr. Crouch, because we know that there are situations where that's all that is present, is the person who is either dead—who is dead, and the person who committed the crime, the person who murdered them.

Although Varughese characterizes this as a comment on his failure to testify, the jury had actually heard two statements from him. One was a tape-recorded statement made by him several days after the fire and the other was a deposition taken a couple of months later with Varughese's lawyer present. The direct evidence showed there was no eyewitness to the start of the fire, so the prosecution could not bring them the testimony of an

eyewitness. The jury heard Varughese's version of the night's events, and he certainly did not claim to be an eyewitness to the start or origin of the fire. So, even with Varughese's statements, the State was unable to produce an eyewitness. We hold this does not comment on the failure of the defendant to testify; rather, it merely reminds the jurors of their promise not to demand an eyewitness in order to convict.

■ In his fourth point of error, Varughese complains his attorney failed to render effective assistance because he did not object to any of the argument referenced in points of error two and three. Because we have found the argument was not erroneous, counsel was not ineffective in failing to object. The fourth point is overruled.

In his fifth point of error, Varughese alleges the trial court erred in allowing improper jury argument depicting him as Hitler. The portion of the argument about which Varughese complains is underlined in the State's argument shown below:

Remember that Dakxie pat-answered everything, I don't know or I don't remember. She didn't know a lot of things that she should have, and she didn't remember a lot of things that she just remembered a few minutes earlier. When you pin her down, she forgets or she doesn't know.

We heard from some statements that she made in a diary that began January of 1991. She admitted that she wrote those statements, and you remember that if they were fun things like toilet papering the house or staying up late waiting for their dad, she remembered the exact event. She remembered writing about it. She remembered it happening. But if it was something that hurt her father like, my father got so drunk and hit my mother last night or I will never forget what he did to me at night or my dad is making me fail these exams because he fought with my mom, she had that convenient lapse of memory. Oh, I forget. I don't remember.

And then she tells you this preposterous story about being Anne Frank. Did you all believe that? That she is writing this diary full of lies that really nobody but herself are supposed to be able to read, and that it's not true. She wants to be Anne Frank. Well, there are some similarities there. Anne Frank was imprisoned because of the Nazies [sic] in power in World War II. *Deepa was imprisoned at 1641 Palisades because this man was in power, this little Hitler here.* There are some similarities there but it's not the fact that this diary wasn't true. She just didn't expect to be confronted with it at her father's murder trial. That's why she denied it. [Emphasis added.]

Dakxie testified regarding her father's drinking; discipline; and arguments between herself and her father, and between her mother and father. Thereafter, the prosecutor asked her about various passages in a diary she had kept the year before her mother's death. The diary notations painted a much bleaker picture of her father, including his discipline, his arguments and fights with her mother, his drinking, her fear of him in the nighttime, and her hopeless outlook at some times. One entry read, "My life is a lonely one now, but I wonder will I be like Anne Frank and someone will find us?" She said what she had written in her diary was basically lies, and she wanted to be like Anne Frank when she was dead—people would read her diary and go through what happened to her, maybe even make a movie. However, her diary had been found a little too soon.

One of Dample's teachers testified that Dample (the oldest child) had confided in her that her father was beating her mother and all the children. Dample asked what could be done, the teacher replied there were services available, and Dample said she would ask her mother and get back with the teacher. This incident occurred within several months before the murder, and alarmed the teacher, who believed Dample was reaching out for help.

There was additional evidence showing Varughese and his wife had arguments or fights serious enough to draw police attention, Varughese had threatened to "kick [his wife's] ass" in front of a police officer. The wife told the officer not to take Varughese to jail because he would kill her, and the wife had received numerous injuries through some

means. The deceased's adult nephew observed her with a bloody nose and head on one occasion, inflicted by Varughese, and Dample's eyes were swollen and her glasses broken. Varughese was completely drunk at that time, according to the nephew.

Dakxie's diary and testimony certainly called up images of Hitler. As pointed out by the State, it is hard to imagine a reference to Anne Frank without thinking about Hitler. Although the prosecutor said "Deepa" (the youngest child) was imprisoned, it is clear he meant to refer to Dakxie. In light of the above evidence, especially Dakxie's diary and her references to Anne Frank, we cannot say this argument was not a fair summary of the above evidence. Even if the argument was objectionable, we conclude Varughese waived any error by failing to object.

Varughese also contends counsel was ineffective because he failed to object to this argument. We will address this contention in our discussion of ineffective assistance of counsel below. The fifth point of error is overruled to the extent it asserts reversible error in the argument comparing Varughese to Hitler.

In his sixth point of error, Varughese argues the trial court erred in permitting the State to improperly argue about his race and nationality. Both Varughese and his wife were born in India, although their children were born in the United States. There was evidence at trial that wife-burning is a fairly common way to dispose of an unwanted spouse in India. Even in the city where Varughese was now living—Carrollton, Texas—an Indian man had burned his Indian wife to death.

The defense attempted to show that suicide by self-immolation was common among Indian women and that suicide of a family member was exceedingly embarrassing to Indian family survivors. Varughese's only defensive theory, other than reliance on reasonable doubt, was that Aleyamma committed suicide. Varughese also attempted to show there were likely to be misunderstandings about what he said, due to his accent and Indian background and, that, if he did not react as some might have expected to his wife's death, this could be attributed to the fact that he was Indian-born and might respond differently.

The State presented several witnesses to show Aleyamma's state of mind around the time of her death, in order to show it was not a suicide. This is the context in which the prosecution argued the following in its first argument (the language to which Varughese now objects is underlined):

Now, in this courtroom there is an American flag and that does stand for something to Americans [sic] citizens. It stands for different things to different people, but in this courtroom, it stands for truth and it stands for justice. And you didn't get a whole lot of truth from this defendant, or from his children. But even though you didn't get the whole truth as they promised to give, you can still give justice for immigrants like this defendant who comes to America. It's the sign of a better life. It's the sign of opportunity, according to the defendant. That he can buy lots of things with all of his new found American wealth.

They come here expecting a better life. Aleyamma Mathew came here to try to be an American. *She actually went through the citizenship course and became a naturalized citizen. This defendant didn't, clinging to the old, clinging to the Indian tradition. This defendant, despite the fact that he is not a naturalized citizen, is accused of a crime and he gets the full spectrum of rights even though he wasn't so considerate for his victim.* He gets every right guaranteed to a citizen in the constitution and his rights have been protected, even though he wasn't so kind to his wife.

This kind of thing may be okay in India but it ain't okay here. This isn't India. In America, this is a crime. Wife burning is not all right [sic]. Women are still people and they deserve to be protected....

In its closing argument, the State said:

Why didn't she take her life? Well, there is a lot of things. She is a trained nurse. She knows about medication. She has been in this profession for at least a dozen years that you can think of....

... She could easily think of a much better way to kill herself. Would a mother who loved and cared for her children, like Aleyamma Mathew cared for these children, would she set herself on fire in such a position that these children she knows are going to see her killed? That that is going to be the lasting memory that these children have of her? ....

She was planning for her children. She had planned to take off two days after this for the 16th birthday of Dample....

Not even in the Indian culture is this something that is common. As Dr. Singh told you, if a wife—unless the husband is already dead. He told you that insecticide is the No. 1 way of suicide. He told you, you know, that jumping down a well and hanging yourselves in the Indian culture are more common than a wife burning themselves. Now, does that sound like the way she would choose? And think about this.

She loved this country. *If there was any of those two people that were Americanized, it was Aleyamma Mathew. Because she took the ability to become an American citizen, she took the ability to raise that hand and say, yes, I will abide by the Constitution of the United States. Did this defendant ever do that? No. He is tied to his traditions over in India.* The No. 1 way that wives are killed is tied to that.

What else do we know that this wasn't a suicide? There was—there is a lack of depression in this situation. The nurses talked about that day, that she was laughing. She was planning for a child's big event.

. . . .

... [Y]our verdict ... means a lot to those first generation Indian people who are in this country. Because it sends a big message to them as new people to this country, and especially to Denton County. Because we know that just a few months earlier, *as I pointed out, that another Indian man did the same thing to his wife.* And we want to make sure, and you can make sure by your verdict, that it's not condoned. [Emphasis added.]

From our review of the record, it appears the prosecutor was summarizing the evidence; explaining to the jury why this had to have been murder, not suicide as the defense had argued; and making a plea for law enforcement. The defense allowed evidence of the cultural differences to become an issue in the case, thereby giving some credence to the only defensive theory, suicide. However, we conclude the prosecutor went too far in emphasizing this is an American court, the victim was American but the defendant is not, and generally accentuating the fact that, although Varughese is not a citizen he is treated like one in the court. This is an appeal to the jurors' possible race or nationality biases. Although we conclude the argument was objectionable, we hold Varughese waived any error by failing to object.

Varughese also contends counsel was ineffective because he failed to object to this argument. We will address this contention in our discussion of ineffective assistance of counsel below. The sixth point of error is overruled to the extent it asserts reversible error in the argument.

In his seventh point of error, Varughese argues the trial court erred in not placing a probation charge in the jury charge on punishment. The prosecutor stated on the record the defense did not wish to pursue the issue of probation, and defense counsel stated that was accurate and that there was no objection to the charge. Furthermore, there was no evidence before the jury to prove Varughese's eligibility for probation. We conclude any error in failing to charge the jury on probation was intentionally waived. We overrule the seventh point of error, except that part asserting ineffective assistance of counsel, which we discuss below.

In his fifth through tenth points of error, Varughese contends counsel was ineffective because he failed to: (1) object to evidence he refused a lie detector test, (2) object to evidence from a newspaper about Aleyamma's previous injuries, (3) object to improper jury argument, or (4) prove up Varughese's eligibility for probation and request a charge on probation. His other contentions of inef-

fective assistance have been overruled above, because we found no error in the voir dire and some of the argument.

The standard for appellate review of effectiveness of counsel at the guilt-innocence phase of a noncapital trial was announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by the court of criminal appeals in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim.App.1986). *Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex.Crim.App.1993).

▪ Appellant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components. First, appellant must show that his counsel's performance was deficient; second, he must show the deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

▪ The first component is met by showing appellant's trial counsel made errors so significant he was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *Id.* When a convicted defendant contends his trial counsel was ineffective, the defendant must show the attorney's representation fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms, from counsel's perspective at the time of the alleged error. *Id.* at 688–89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

> [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

▪ The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. A defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

▪ The question for our review is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt on the issue of guilt, considering the totality of the evidence. *See id.* at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *See id.*

Varughese gave a recorded statement and a lengthy deposition to agents of his insurer. At the end of the two-hour recorded statement, the following exchange took place:

Q. Okay. In the event that this should go further would you be willing to take a polygraph test?

A. I haven't been (inaudible) because—you know, I don't believe in polygraph because—

Q. Okay.

A. There is so many people end up in jail.

Q. Um-hum.

A. Because of this—especially, you know, (inaudible).

Q. Um-hum.

A. I don't trust these polygraph.

Q. Especially, with what deal?

A. You know, Anita Hill.

Q. Anita Hill?

A. Yeah.

▪ Part of the defense strategy was to emphasize how open and cooperative Varughese behaved after his wife's death. Additionally, the defense specifically argued to the jury that they should listen to the tape, hear Varughese speak and notice his communication difficulties when conversing in English. It appears that the failure to object was part of a trial strategy of showing the jury Varughese was being truthful and revealing harmful facts along with those that helped him. Indeed, defense counsel argued to the jury that his client had told things to the police and other investigators that hurt

his case; for example, he had admitted he had quarreled with his wife on the night of her death.

There is no evidence Varughese was ever actually offered a polygraph test and refused. The State made no argument about Varughese's dislike of the polygraph. Perhaps in hindsight the failure to object looks like poor strategy or none at all, but we are obligated to judge counsel's effectiveness at the time the alleged mistake was made, not after the trial is over and the defendant sentenced.

In the ninth point of error, Varughese contends he was denied effective assistance of counsel when his attorney failed to object to discussion of a newspaper account of the deceased's previous injuries. He complains that trial counsel failed to object to the following exchange from his deposition:

> Now, I asked you earlier if you had read the newspaper accounts and you said you had. Now, there is some indication in there that your wife had come to work where she had a broken nose and black eyes, an open wound on her right hand. Do you have an explanation why her— members of the staff there at Parkland would make those comments to the press.

Varughese answered this question with the observation that only the Indian people Aleyamma worked with made those type of comments—mainly because they were envious of Aleyamma's comparative wealth. He also provided information about all of Aleyamma's doctors and treatments to help the insurer check out the allegations of abuse.

The State produced evidence that the police had been to Varughese's home twice for wife abuse; at least once Aleyamma's adult nephew had seen her bloody; and one child's teacher testified the child told her Varughese was beating his wife and children. The jury heard testimony that Aleyamma told at least the police and her nephew that Varughese would kill her. Varughese managed to exclude testimony of Aleyamma's co-workers describing her previous injuries. In light of the first-hand testimony about the fights between Varughese and his wife, as well as the absence of any medical or even first-hand testimony about the injuries mentioned in the newspaper and the absence of any testimony by fellow workers about the abuse, the jury was unlikely to have given much consideration of the newspaper account. In fact, the jury did send out a question about the teacher's testimony, but none about the newspaper account. We conclude defense counsel was simply following the strategy of allowing the jury to hear everything, favorable and unfavorable, in the hope his client would appear open and honest despite the fact he never took the stand.

We also conclude the failure to object to the State's argument waving the American flag and emphasizing Varughese's lack of citizenship, as well as the "Hitler" argument was part of this same strategy of allowing the jury to hear everything. Furthermore, the defense itself argued Varughese's cultural and language differences, as well as the suicide theory, his only defenses. Under these circumstances, we cannot say that even a sustained objection would have had any probability of changing the outcome of either phase of the trial.

Varughese also contends counsel was ineffective because he did not request a charge on probation at the punishment hearing. In light of the jury's 75 years' sentence, we conclude the failure to request a charge on probation was harmless beyond a reasonable doubt. Furthermore, Varughese did not testify at either phase of trial, and there is no indication that anyone else had the requisite knowledge to prove up his eligibility for probation. Defense counsel made an excellent jury argument and presented two character witnesses at the punishment phase. The fact the jury set his punishment at only 75 years is something of a victory in light of the victim's painful and gruesome death.

The fifth through tenth points of error are overruled.

In his eleventh point of error, Varughese asserts the trial court erred in overruling his motion for new trial. In his motion for new trial, Varughese alleged he should be granted a new trial based on newly discovered evidence, scientific evidence that the shirt with

the singed fibers may not have been in a flash fire.

Varughese's allegations stem from a failure to get earlier and more complete discovery. Shortly before trial, Varughese filed a motion for continuance alleging he had not been given all the discovery the court had ordered and he was, therefore, not ready for trial. At the hearing on the motion for continuance, it appeared the only thing lacking was a report from Patricia Eddings regarding a shirt found near the fire, which presumably belonged to Varughese. At the hearing, the prosecutor testified that, just the night before, she had received an oral report from Eddings [2] about her findings on the shirt, but no written report had been prepared. The prosecutor stated, "[A]ll that was found on them was singed fibers on the T-shirt itself and singed hairs."

Additional evidence at the motion for continuance showed Varughese wanted to have his investigator and expert examine the physical evidence and/or scientific reports. It also showed Varughese's counsel had been hired shortly after the fire occurred in April of 1992. The trial court denied the motion for continuance.

At trial, Eddings testified the polyester fibers on the 50% cotton–50% polyester shirt had been singed and melted, but not the cotton fibers. This could only be seen through a microscope. Only the fibers on the front of the shirt were singed and melted. This pattern of burning and melting was produced in milliseconds, and had to "occur in a flash situation, a very intense amount of heat in a very short period of time." Eddings opined that the person wearing the shirt was close to the source of ignition when the fire started.

In his motion for new trial, Varughese alleged that he had newly discovered favorable evidence, the testimony of Alan B. Weckerling, a scientist. Attached to the motion was Weckerling's affidavit stating that the singeing and burning are not conclusive evidence that the shirt was exposed to the ignition of a gasoline fire. He averred,

"Such damage could have been caused by a variety of events including, but not limited to, exposure to radiant heat from a hot burning fire."

A great deal of physical evidence from, as well as photographs taken from, the burned house was introduced at trial, along with expert conclusions that the fire was started by gasoline placed on or near Aleyamma while she was sleeping or near the bed. There was evidence that Varughese was attempting to put out the fire, but was not in the bedroom when the fire broke out. Eddings' testimony was virtually the only evidence that placed Varughese in the bedroom when the fire began. No doubt it was damaging to the defense.

However, the defense knew well before trial that a scientific investigation was being made in this case. The fire was April 5, 1992 and Varughese's criminal trial counsel was present when the insurance company took Varughese's deposition on June 2, 1992. Varughese was served with the indictment on October 23, 1992, and trial began January 11, 1993. The motion for continuance was heard January 8, 1993. Defense counsel's main complaint was he had not been able to get together with the prosecutor to go over the evidence and have his investigator and expert review it in the short time between trial and the time the motion for discovery was heard on December 18, 1993. However, defense counsel offered no explanation for why he waited until December 18th to begin his scientific preparation of this case. Furthermore, Weckerling's affidavit attached to the motion for new trial does not indicate that Weckerling had examined the shirt discussed in the affidavit or that he had come to any conclusion about the significance of the condition of the shirt; therefore, it was likely to carry little weight with the court. Although an investigator and chemist had been employed by January 8th, the expert witness had still not examined the shirt by the time he made his affidavit on February 19, 1993. Under these circumstances, we cannot say

2. Eddings was a trace analyst from the Tarrant County Medical Examiner's Office Crime Laboratory.

that the defense demonstrated diligence or that the trial court erred in denying the motion for continuance. The eleventh point of error is overruled.

Although not specifically urged to do so in Varughese's brief, we also took the eleventh point of error into consideration in evaluating his claim that counsel was ineffective. Although there are some indications counsel was not optimally prepared for trial, there is nothing in the record to show us a different outcome would have been likely if the defense had been better prepared. Most of the alleged errors of counsel appear to be part of a coherent trial strategy. In hindsight, it is apparent this strategy did not work. However, nothing in the record shows us any strategy that had any better likelihood of being effective and there is no indication that any additional evidence, other than that of Weckerling, could have helped Varughese.

Having overruled all of Varughese's points of error, we affirm the judgment of the trial court.

FARRAR, J., not participating.