**Opinion issued July 14, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00294-CR

———————————

**ALBERT TORRES NIEVES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1392793**

## MEMORANDUM OPINION

Appellant Albert Nieves was convicted of aggravated sexual assault of a child under the age of 14 and sentenced to ten years' confinement. We affirm.

## BACKGROUND

Appellant and his wife Brenda have two children. Brenda's sister, Noemi, and Noemi's husband, Lincon, have three children, one of whom is the complainant, Julie.[1] The two families were very close; they would frequently socialize and spend the night at each other's homes. When Julie and her brothers stayed at appellant's apartment, Julie would sleep in the same bed with her younger female cousin.

On Thursday, June 2, 2011, when she was 4 years' old, Julie went with her siblings to stay the night at appellant's apartment.[2] She woke up in the middle of the night to a "weird feeling" from appellant licking her "privates." He had pulled off her pants and pulled her underwear down. At trial, she described his actions in detail, and demonstrated his actions with two dolls. She testified that she was scared and nervous to tell anyone. She said that this was not the first time appellant had licked her private parts.

The following day, after Julie and her brothers returned home, Noemi noticed that Julie was sucking her thumb, and "quiet and kind of angry." When Noemi asked Julie how the sleepover went, Julie responded, "with an angry face and tone of voice, . . . 'I don't know why [appellant] always does this.'" When

---

[1]  We use the pseudonym "Julie" to refer to the minor complainant. *See* TEX. CODE CRIM. PROC. ANN. art. 57.02(h) (West Supp. 2014).

[2]  Julie was 7 years' old when she testified at appellant's trial.

2

Noemi asked what Julie meant, she replied, "nothing." Noemi testified that, a few hours after this first interaction, Noemi pressed Julie to explain what appellant always does to her. Julie responded, "He always pulls my pants down." When Noemi asked "what for?," Julie told her that appellant licks her privates. Noemi testified that "privates" is a phrase she and Julie would use to refer to female genitalia.

Noemi took Julie into another room where her husband Lincon was reading and asked Julie to tell Lincon what she had told Noemi. After Julie told Lincon what appellant had done, they sent Julie off to play and discussed what to do. Noemi called her brother Cesar to come over. Cesar in turn called Brenda and appellant to come over to talk. When they confronted appellant, he denied the allegations.

After Cesar and appellant's family left, Brenda gave Julie a bath. Before her bath, Julie had on the same clothes she had worn the previous night at appellant's apartment. Noemi asked Julie to pick up her dirty clothes off the bathroom floor after her bath, but Julie forgot her underwear on the floor. It occurred to Noemi the next morning, Saturday, to preserve the underwear, so she picked them up off the floor and secured them in a ziplock bag. That night, she and Lincon decided to take Julie to be examined at the pediatrician's on Monday. Monday morning,

3

Noemi took Julie to the pediatrician, who in turn directed Noemi to Texas Children's Hospital.

Julie was examined at Texas Children's Hospital and later interviewed at the Children's Assessment Center. Sergeant J. McClure with the Crimes Against Children Division of the Harris County Sheriff's Office attempted to contact appellant about the allegations, but appellant's attorney called McClure to let him know that appellant would not give him a statement.

DNA testing on Julie's underwear revealed that Julie was a major DNA contributor and that two males were minor contributors. Appellant could not be excluded as a contributor.

A jury found appellant guilty of aggravated sexual assault of a child and assessed punishment at confinement for ten years. The trial court entered judgment on the jury's verdict, and appellant brings this appeal.

### ISSUES ON APPEAL

Appellant raises the following seven issues:

1. "Appellant was denied due process by trial counsel's failure to raise appellant's ethnicity in relation to the DNA evidence."

2. "Appellant was denied due process by trial counsel's failure to object to the prosecution's statement that appellant's DNA was present in the complaining witness' panties."

3. "Appellant was denied due process by his own trial counsel's statement to the jury that appellant's DNA was present in the complaining witness' panties."

4

4.    "Appellant was denied due process by trial counsel's failure to retain a DNA expert."

5.    "The cumulative effect of trial counsel's error regarding DNA evidence denied appellant of due process."

6.    "The trial court erred by admitting a second outcry statement from the complaining witness."

7.    "The evidence was insufficient to support a conviction for aggravated sexual assault of a child under 14 years of age."

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellants first five issue allege ineffective assistance of counsel.

### A.    Standard of Review

To determine whether appellant's trial counsel rendered ineffective assistance at trial, we must first determine whether appellant has shown that counsel's representation fell below an objective standard of reasonableness and, if so, then determine whether appellant was prejudiced. *Wiggins v. Smith*, 539 U.S. 510, 522, 123 S. Ct. 2527, 2535 (2003); *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 2064 (1984); *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). We must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance, and an appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). An allegation of ineffective assistance must be firmly founded in the record, and the

5

record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking as to overcome the presumption that counsel's conduct was reasonable and professional. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Rarely will the record on direct appeal contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation. *Id*. When a record is silent as to trial counsel's strategy, we "will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

In addition, "appellant must show that this deficient performance prejudiced his defense." *Bone*, S.W.3d at 833. "This means that the appellant must show a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.

## B.  Parties' arguments

In his first five issues, appellant argues that he was denied due process by his counsel's alleged ineffective assistance regarding his handling of the DNA evidence at trial. Specifically, in his first four issues, appellant claims his counsel was ineffective by (1) failing to "raise appellant's ethnicity in relation to the DNA

evidence," (2) failing to "object to the prosecution's statement that appellant's DNA was present in the complaining witness' panties," (3) counsel's "stat[ing] to the jury that appellant's DNA was present in the complaining witness' panties," and (4) failing "to retain a DNA expert." In his fifth issue, he claims the cumulative effect of these alleged errors denied him due process.

The State responds that the "totality of representation afforded the appellant was above the prevailing processional norms" and that, "without a record as to trial counsel's approach or reasoning for his decisions, none of the appellant's claims rebuts the strong presumption of a sound trial strategy." The State also contends that appellant has not shown harm.

## C.    The DNA evidence

Michal Pierce, a DNA analyst with the Harris County Institute of Forensic Sciences, testified that she examined Jane's underwear for DNA material. Pierce described her experience employing methods of extraction, quantification, amplification, and genetic analysis, as well as the protocols and safeguards that are used to ensure the integrity of DNA tests.

Pierce explained the process, through DNA profiling, of labeling a person "excluded" or as "included" as a possible contributor of DNA material. When processing this type of sexual assault case, the laboratory ignores the female DNA

and looks only at male DNA on examined items, resulting in a "Y profile." Pierce

testified that the effect of examining only male DNA alters the statistics:

> The only difference that we had when I'm doing my analysis is that I need to keep in mind that for Y profiles, that is not individualizing. A man's Y chromosome is passed down directly from his biological father to the point where everybody on your patrilineal side, your biological father, your brother, your grandfather on the paternal side, you-all have the same Y-STR profile. So, it's not individualizing. There's several people in the world with that same Y profile.
>
> So, the statistics will be smaller if I've made an inclusion as you see here. Again, this is not necessarily from this case, but the numbers will look like 1 in 1685 Caucasians, 1 in 1601 African-Americans, 1 in 285 Hispanics. So, that is always going to be true that your statistics for your Y profiles will be lower if you have an inclusion.

Pierce testified that analysis of Julie's underwear revealed two different

males contributed to the Y profile. Comparisons with appellant's DNA indicated

that appellant could not be excluded as a contributor to this Y profile. Pierce then

again explained the statistical profiles generated when examining only Y profiles:

> Q. What is the probability -- because you previously testified that Mr. Nieves could not be excluded as a contributor to the DNA that was found on the inside crotch of those panties. What was the probability that he could not be excluded?
>
> A. So, for the Y-STR profile where I said he could not be excluded, the statistic I generated was 1 in 1,685 for Caucasians; 1 in 1,601 for African-Americans; 1 in 285 for Hispanics.
>
> Q. So, does that mean that if you selected a random person -- can you kind of explain that statistic to us and how it compares?
>
> A. Yes. It means that if I had -- what this stat is meaning literally, if you took it in the literal context, if I had 1,685 Caucasian males, by the statistic I would expect only one of those males to have the profile that Mr. -- that the -- that Mr. Nieves, where he was

8

consistent in the panties, that profile, that's how common or rare that profile is in terms of Y-STRs. It's an approximate statistic. It doesn't mean that if there was 1,684 I wouldn't find someone.

Appellant's counsel cross-examined Pierce extensively about the limits of the information derivable from her analysis. For example, the presence of male DNA on Julie's underwear does not indicate the source of that DNA (i.e., whether it is from incidental contact or a bodily fluid such as saliva or sweat). Pierce could not determine with a reasonable degree of scientific certainty whether the DNA was deposited there through primary or secondary transfer (i.e., transferred through direct contact or instead through Julie's underwear coming in contact with a surface upon which DNA material was previously shed). And, although the inside of the underwear was swabbed for DNA testing, there is no way to ascertain how the underwear was actually worn (i.e., right-side-in or inside-out).

Appellant's counsel elicited testimony from appellant about why his DNA material may have been found on Julie's clothes. Appellant testified that, when Julie stayed at his apartment (as well as when his family stayed overnight at Julie's family's house), appellant helped make dinner for Julie and the other children. He also helped Julie and the other children brush their teeth, wash their hands, and assisted them when they needed help removing clothes to use the toilet. Appellant also helped Julie wipe with toilet paper after using the toilet. Appellant often would use the same bathroom as the children.

9

Appellant further testified that both families' clothes were sometimes washed together, and that clothes belonging to Julie and to his youngest daughter often got mixed up. He stated that there was a chance he could have touched Julie's underwear if she left them on the floor with her dirty clothes and he picked them up. Appellant's counsel also elicited testimony from appellant's wife Brenda that appellant may have assisted in washing Julie's clothes, and that appellant sweats heavily.

During closing argument, appellant's attorney addressed the DNA evidence, arguing to the jury that it was not indicative of appellant's guilt:

> All right. So, we've got the underwear. Let's talk about that. I guess the best way to look at it and see how that helps you, if any, in deciding whether or not the State proved their elements beyond a reasonable doubt is to consider the testimony of the DNA expert. And, yes, when I asked her questions, I worded them very carefully. It's my job, but I wanted to pin her down. And we could have brought an expert in here.

> We could have gotten a DNA expert and brought the DNA expert in here, had our DNA expert testify, and say the same thing or something else, but then, of course, the State is going to get a chance to ask questions and say: Well, they paid you to come in here. We didn't need to do that. This expert, the State's own expert, told you exactly what we believe and wanted you to hear, that there's nothing about those panties that shows that Mr. Nieves sexually abused -- that he licked the sexual organ, put his mouth on the sexual organ of [Julie]. And the State's making a point about, well, the primary -- let me back up. The State's making a big point about the fact that the primary contribution of DNA in those panties is from Mr. Nieves and trying to suggest to you that that couldn't have come just from casual contact, from incidental contact, or from surface to surface -- from contributor to surface onto those panties contact, but that's not what

the DNA expert said. She said that she could not say with a reasonable degree of scientific certainty that that's how it happened, that it was from -- first of all, she can't say it's saliva. Second of all, she can't say that it was directly from the contributor, Mr. Nieves, to the panties. Or she – you know, and she can't say that it was Mr. Nieves to her body to the panties. We just don't know how that got there. And there are many explanations that are just as consistent with innocent activity as there are with any other activity. There is no solid, believable proof that the DNA on the panties from Mr. Nieves got there because he licked her. It's just not. That's not what she said. You heard the testimony. You heard it.

There's someone's else DNA on there, too, another male contributor, but the State will have you believe, well, that's probably, probably, incidental contact because there's not so much of it there. Maybe it wore off, but what is that? They're going to say: Well, what's it doing in the crotch of the panties? Well, what's this other DNA doing in the crotch of the panties? And what about the rest of the panties? We didn't hear anything about any DNA from anywhere else on the panties. We didn't.

**D.  Analysis**

We agree with the State that trial counsel's representation related to the DNA evidence was not constitutionally deficient.

Appellant did not raise his ineffective-assistance-of-counsel claim in a motion for new trial nor did he present any evidence in support of his claim to the trial court. *Id.* It is easy to glean from the trial transcripts, however, what trial counsel's strategy was with regard to the DNA evidence. *See Ex parte Gutierrez*, 337 S.W.3d 883, 896 (Tex. Crim. App. 2011) ("Although there is no explicit explanation from counsel why he did not ask for [DNA] testing, counsel's strategy became clear at trial.").

11

Trial counsel's strategy here was not to disprove that it was appellant's DNA found on Julie's underwear. Rather, the strategy was to emphasize that there were plausible, innocent reasons that appellant's DNA could be found on Julie's underwear. In addition, appellant's counsel cast doubt on the thoroughness of the police investigation by questioning why other areas of the underwear were not tested for DNA material. Each of appellant's ineffective-assistance arguments— viewed in context of this strategy—fail here. *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007) (if the reasons for counsel's conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, an appellate court must defer to counsel's decisions).

*Ethnicity*

Appellant testified that he is Puerto Rican. In his first issue, appellant argues that "there is no plausible basis for trial counsel's failure to raise appellant's Hispanic heritage on cross examination of the State's DNA expert and in closing argument." He insists this failing was significant in light of the statistical evidence presented by Pierce, the State's DNA expert. Pierce testified that 1 in 285 Hispanic males would match the Y-STR profile derived from the DNA material found in Julie's underwear. Appellant points out that statistic "is significantly

more favorable to appellant than the 1 in 1.685 statistic for Caucasians and the 1 in 1,601 statistics for African-Americans."

The jury heard evidence that appellant was Hispanic. Although appellant insists that his counsel should have "raised appellant's Hispanic heritage" when cross-examining Pierce, he does not argue that there was any more favorable statistical information to be derived from Pierce than that already heard by the jury. Appellant's counsel thoroughly cross-examined Pierce in a way that effectively bolstered the defense that there were innocent explanations for the presence of appellant's DNA on Julie's underwear. Appellant has not established that counsel's strategic decision to focus cross-examination of Pierce on the innocent ways in which appellant's DNA could find its way onto Julie's underwear rather than trying to convince the jury to acquit because of a 1 in 285 chance that the DNA material found in Julie's underwear could match a different Hispanic male "fell below an objective standard of reasonableness." *McNeil v. State*, 452 S.W.3d 408, 413 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

As for counsel's failure to raise, during closing arguments, the difference in statistical probabilities of a DNA match between Hispanic males and Caucasian males, we recognize that counsel's decision about what evidence and arguments to include and emphasize in closing argument is inherently tactical and "need[s] to be made based on the way a trial is unfolding, the trial strategy employed, the

experience and judgment of the defense attorney, and other factors." *Taylor v. State*, 947 S.W.2d 698, 704 (Tex. App.—Fort Worth 1997, pet. ref'd). Appellant's counsel focused his closing argument on numerous places that the jury could find reasonable doubt. He urged the jury to believe appellant's testimony that he did not sexually assault Julie, and to look to Julie's lack of memory about certain things when she was testifying. He pointed to inconsistencies in Noemi's testimony and her incentives to cooperate with the police even if it meant lying about appellant. Finally, counsel argued that there were plausible innocent explanations that would account for appellant's DNA on Julie's clothes.

Appellant has not shown that his counsel's failure to emphasize the statistical significance of appellant's ethnicity as it relates to the DNA evidence was not pursuant to a reasonable trial strategy. We overrule appellant's first issue.

*DNA Match*

In his second and third issues, appellant argues that his trial counsel's representation was deficient because he (1) failed to object when State's counsel stated that appellant's DNA "matched" the male profile of the DNA found on Julie's underwear, and (2) told the jury during closing argument that appellant was "the primary contribut[or]" of DNA found in Julie's underwear. The first complaint is based upon counsel's failure to object to this exchange during the State's cross examination of appellant:

14

Q. Yes. And you heard the testimony that there was a full male profile that was identified from the inside crotch of the panties and that was identified and documented before you even provided a sample to law enforcement. Did you understand that?

A. I do.

Q. Okay. And once you gave your DNA sample, your DNA matched to the male profile --

A. Correct.

Q. -- that had been found on the inside crotch of the panties?

A. Correct.

Appellant argues here that the State's characterization of appellant's matching the DNA male profile was a "gross mischaracterization of the facts and misleading." He further argues that there "is no plausible trial strategy for appellant's trial counsel's failure to object to this questioning from the prosecution."

His second complaint relates to his trial counsel's referring to him, during closing argument, as a contributor to the DNA found in Julie's underwear:

The State's making a big point about the fact that the primary contribution of DNA in those panties is from Mr. Nieves and trying to suggest to you that that couldn't have come just from casual contact, from incidental contact, or from surface to surface -- from contributor to surface onto those panties contact, but that's not what the DNA expert said. She said that she could not say with a reasonable degree of scientific certainty that that's how it happened, that it was from -- first of all, she can't say it's saliva. Second of all, she can't say that it was directly from the contributor, Mr. Nieves, to the panties. Or she – you know, and she can't say that it was Mr. Nieves to her body to the panties. We just don't know how that got there. And there are many

15

explanations that are just as consistent with innocent activity as there are with any other activity. There is no solid, believable proof that the DNA on the panties from Mr. Nieves got there because he licked her.

Appellant contends that calling his DNA a match or contributor is erroneous because of the probability that 1 in 285 Hispanic males match the Y-STR profile. Further, he contends that there "is no conceivable strategic purpose for appellant's trial counsel to make the statements he did regarding the DNA evidence in closing argument."

The jury heard detailed testimony from Pierce about the process of DNA profiling, and Pierce was careful to clarify several times that the results did not mean that appellant was a "match":

> A.    . . . . And the interpretation part is basically, again, I'm looking to see is this profile from the evidence consistent with a known person's profile and if so, what do I do with it. If it's not consistent, I will exclude that person. I will say this person did not contribute the DNA, they're excluded. If the DNA profiles are consistent between each other, I will use language which is "included." And I can say this person is included as being a possible contributor. And what I will do then is I will generate a statistic for that inclusion . . . .
>
> . . . .
>
> Q. Ma'am, can you go ahead and compare that known profile that came from the pink panties to the known profile of Albert Nieves?
>
> . . . .
>
> A. For both the STR and Y-STR. So, in terms of the pink panties, I'll just say that the DNA results, there was a mixture of DNA. The mixture in the STR profile, there was a -- what's called a

16

major contributor, meaning someone contributed more DNA than the other person who contributed, and that major contributor was [Julie]. And then there was a what I call minor allele, meaning somebody contributed in a less amount for a minor allele, and that was from the first report.

And then I had developed a Y profile from the panties, as you see on the bottom chart. And that, too, was what I called a mixture. I said there were two males in that mixture. And in this chart, I had made the concl -- by looking at this chart, I made the conclusion that Mr. Nieves could not be excluded as a contributor to this Y profile. And then I generated a statistic to back up that inclusion.

Q. How do you know that Mr. Nieves cannot be excluded? Can you take us through these loci that are depicted here?

A. Sure.

Q. How do you know that?

A. the numbers in this location and this location, this location, every time there was something detected in the pink panties, that allele was consistent with Mr. Nieves' alleles.

Q. For example, if we look at this first allele, what is the number for the known saliva of Albert Nieves?

A. That location is a 13.

Q. And for the pink panties, what was the result there? What is the number?

A. That was also a 13.

Q. Okay. And if we go along this entire row for these 16 -- is it correct to say alleles or 16 loci?

A. Yes, locations.

Q. Do all 16 loci match to Albert Nieves?

A. Let me just make one correction because – I'm sorry. Can you repeat the question?

17

Q. Okay. Just walking through this chart, how do you know that the Y-STR profile that was from the pink panties is Mr. Nieves' or that he cannot be excluded?

A. Right. I'm not saying it's Mr. Nieves.' I'm saying he cannot be excluded because there is consistency in each location I tested.

Given the detailed testimony by the State's expert, it is unlikely that the jury was unduly confused by the complained-of reference to appellant as a "match" or "contributor." More importantly, trial counsel's failing to object to the State's characterization of the "match" and his own reference to appellant as a contributor is consistent with the trial counsel's strategy of not disputing that it was likely appellant's DNA materials found on Julie's underwear, but that there were innocent explanations for that. We have already rejected appellant's argument that such a strategy was not objectively reasonable. And the goal of appearing open and honest with the jury has been recognized as a plausible trial strategy for both failing to object and for making concessions during closing arguments. *See, E.g.*, *Bailey v. State*, No. 14-04-00325-CR, 2006 WL 348132, at *6 (Tex. App.— Houston [14th Dist.] Feb. 14, 2006, no pet.) (mem. op.; not designated for publication) ("[C]ounsel's failure to object to the tape itself may have constituted a plausible trial strategy, such as a plan to appear open and honest with the jury." (citing *McKinny v. State*, 76 S.W.3d 463, 473 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Stroman v. State*, 69 S.W.3d 325, 332 (Tex. App. —Texarkana 2002, pet. ref'd); *Varughese v. State*, 892 S.W.2d 186, 196 (Tex. App.—Fort

18

Worth 1994, pet. ref'd)); *Thompson v. State*, 915 S.W.2d 897, 904 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (concluding that trial counsel's stating in closing argument during guilt-innocence phase that he and defendant believed they "should not insult people's intelligence and the real issue in this case we have always believed is one of punishment" was part of a plausible trial strategy, in light of significant evidence of guilt, "to appear open and honest to the jury in hopes of mitigating punishment.").

Appellant has not shown that his counsel's failure to object to the State's characterization of his DNA as a "match" or that counsel's conceding that appellant was a contributor to the DNA found on Julie's underwear was objectively unreasonable or inconsistent with counsel's reasonable trial strategy of focusing on innocent ways in which appellant's DNA could have made its way onto Julie's underwear. We overrule appellant's second and third issues.

*DNA Expert*

In his fourth issue, appellant argues that his trial counsel's not hiring a DNA expert amounted to ineffective assistance. He cites two cases for the proposition that "failure to present expert testimony can constitute ineffective assistance of counsel." *See Ex Parte Briggs*, 187 S.W.3d 458 (Tex. Crim. App. 2005) (failure to present expert medical testimony in murder trial was ineffective given the relevance of the cause-of-death to the defense and the record indicating that the

decision was "not a 'strategic' decision, it was an economic one."); and *Wright v. State*, 223 S.W.3d 36 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (failure to investigate therapy notes about child complainant was ineffective given "appellant's trial counsel did not have a strategic motive for not fully investigating the complainant's therapy sessions or utilizing an expert to review [therapist's] notes or assist in the cross-examination of witnesses"). Appellant acknowledges that his trial counsel explained in closing argument to the jury that appellant did not need his own expert because the State's own expert provided all the information appellant needed in support of his theory, but contends that "appellant's trial counsel did not understand what the State's DNA expert was saying."

This case is distinguishable from *Briggs* and *Wright*. Nothing in the record here indicates that trial counsel did not sufficiently understand the DNA evidence or that counsel did not hire a consulting (as opposed to a testifying) expert to aid his understanding of the science or develop his defensive strategy. In contrast with the records in *Briggs* and *Wright*, there is no affirmative evidence here that counsel's decision to not call DNA expert to testify at trial was driven by non-strategic reasons. And counsel effectively utilized the State's expert in this case to make his point that the DNA evidence was not dispositive of appellant's guilt. *In re Napper*, 322 S.W.3d 202, 247 (Tex. Crim. App. 2010) (recognizing that, in

20

some cases, "[c]ross-examination may render unnecessary the presentation of one's own expert"); *Skinner v. State*, 293 S.W.3d 196, 202-03 (Tex. Crim. App. 2009) (failure to hire expert to do additional DNA testing was not ineffective assistance given trial counsel's explanation that "he did not ask for testing because he was afraid the DNA would turn out to be appellant's and that "conducting its own DNA test would also have deprived the defense of its primary argument at trial that the government conducted a shoddy investigation"); *see also Hawkins v. State*, 278 S.W.3d 396, 403 (Tex. App.— Eastland 2008, no pet.) (appellant did not show that trial counsel's failing to present DNA expert witness was ineffective assistance when it "has not been shown to what that expert would have testified").

Appellant has failed to demonstrate that trial counsel's failure to present a DNA expert witness at trial was objectively unreasonable or inconsistent with counsel's reasonable trial strategies of focusing on (1) innocent ways in which appellant's DNA could have made its way onto Julie's underwear, and (2) the investigators' failure to identify the other source of male DNA on the underwear. We overrule appellant's fourth issue.

*Cumulative error*

Finally, in his fifth issue, appellant argues that the cumulative effect of trial counsel's ineffective assistance regarding the DNA evidence amounted to a denial of due process. Having found no ineffective assistance related to trial counsel's

21

handling of the DNA evidence, there can be no cumulative error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) ("Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.'")

We overrule appellant's fifth issue.

## HEARSAY STATEMENT

In his sixth issue, appellant argues that the trial court erred by overruling his hearsay objection during the direct examination of Julie's father, Lincon:

> Q. Did your wife tell you that the defendant had sexually abused Lizzie or did Lizzie tell you that?
>
> A. Lizzie –
>
> DEFENSE COUNSEL:  I object to the leading question, Your Honor.  And I object to the hearsay.
>
> THE COURT: Overruled.
>
> Q. You can answer.
>
> A. Julie – Noemi asked her to tell – Julie to tell me.  Julie told me.

 "Hearsay" is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). An out-of-court "statement" need not be directly quoted in order to run afoul of the hearsay rules. *See Head v. State*, 4 S.W.3d 258, 262 (Tex. Crim. App. 2009).

Pursuant to Rule 44.2(b), an error is not reversible error unless it affects a substantial right of the defendant. A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). When conducting a Rule 44.2(b) harm analysis based upon the erroneous admission of evidence, an appellate court should consider everything in the record, including:

> [A]ny testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error.

*Rich v. State*, 160 S.W.3d 575, 577–78 (Tex. Crim. App. 2005).

Appellant argues that Julie's "statement to her father about the alleged assault is hearsay." TEX. R. EVID. 801. He further contends that this statement "does not fit the hearsay exception of an outcry statement because Lincon [] is not the first person to whom Julie described the alleged sexual assault." TEX. CODE CRIM. PROC. ANN. art. 38.072.

Failure to object to the same evidence offered elsewhere at trial waives an objection to the admission of evidence. TEX. R. APP. P. 33.1(a)(1)(A); *Hitt v. State*, 53 S.W.3d 697, 708 (Tex. App.—Austin 2001, pet, ref'd) ("Overruling an objection to evidence will not generally result in reversal where other evidence of that same fact was received without objection, either before or after the

23

complained-of ruling, regardless of whether the other evidence was introduced by the defendant or the State.").

Appellant failed to object to Noemi's testimony that Julie told Lincon about the sexual assault:

> A. I asked her if we could tell her daddy.
>
> Q. What was her demeanor like when you asked her that?
>
> A. She didn't – she hesitated, but I asked her again if we could please tell her dad, that we could trust him, and she said yes.
>
> Q. So where did you guys go?
>
> A. So, we went to our room, to the master, my husband and I.
>
> Q. What was Lincon doing in the master bedroom?
>
> A. He was in the bed, reading.
>
> Q. What happened next in that room?
>
> A. So, I told him that Julie wanted to say something.
>
> Q. And what happened?
>
> A. She told him what she had told me.
>
> . . . .
>
> Q. After Julie told your husband what she had told you – well, first of all, who told him first that Julie was saying that A.J. had licked her. Who told him first?
>
> A. Julie told him.

Because the same information was introduced through Noemi's testimony, appellant has not preserved his complaint about the trial court overruling his

hearsay objection to Lincon's testimony that Julie is the person who told him about the sexual assault.

We overrule appellant's sixth issue.

## SUFFICIENCY OF THE EVIDENCE

In his seventh issue, appellant argues that "the evidence was insufficient to support a conviction for aggravated sexual assault of a child under 14 years of age."

In evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (*citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89).

A person commits the offense of aggravated sexual assault of a child if, with a child younger than fourteen years, the person intentionally or knowingly causes

25

the sexual organ of the child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor. TEX. PENAL CODE ANN. § 22.021(a)(2) (West 2011).

Appellant argues that the evidence is insufficient because the "only evidence in this case is an outcry statement from a four year old child and DNA evidence that merely finds that appellant cannot be excluded." But the jury heard Julie's testimony about appellant, on more than one occasion, licking her "privates," i.e., causing her sexual organ to contact appellant's mouth. TEX. PENAL CODE ANN. § 22.021(a)(1)(B), (a)(2)(B)(West 2011). Julie described the licking motion and demonstrated the act and appellant's position with anatomically correct dolls. The uncorroborated testimony of a child victim is alone sufficient to support a conviction of aggravated sexual assault of the child. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2013); *Johnson v. State*, 419 S.W.3d 665, 671–72 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Julie's trial testimony was also consistent with Noemi's testimony about Julie's initial outcry. In addition, the jury heard evidence that appellant could not be excluded from the DNA profile from the swab of Julie's underwear. Reviewing the record in the light most favorable to the verdict, there is sufficient evidence for a rational trier of fact to have concluded beyond a reasonable doubt that appellant was guilty of each element of aggravated sexual assault of a child. *Johnson*, 419 S.W.3d at 671.

26

We overrule appellant's seventh issue.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).