**Opinion issued March 31, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NOS. 01-20-00768-CR**
**01-20-00769-CR**

———————————

**BYRON EUGENE COLEMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 18CR0071 & 18CR1738**

## MEMORANDUM OPINION

Appellant, Byron Eugene Coleman, pleaded guilty to unlawful possession of a firearm by a felon,[1] and, in a companion case, a jury found him guilty of murder

---

[1] *See* TEX. PENAL CODE § 46.04(a). Trial court cause number 18CR0071 and appeal number 01-20-00768-CR.

and found one enhancement paragraph true.[2] The trial court assessed his punishments at 10 years' confinement and confinement for life, respectively. In four issues, appellant contends that (1-2) he received ineffective assistance of counsel at trial; (3) trial counsel had a conflict of interest; and (4) the evidence is legally insufficient to support the murder conviction.  We affirm.

## BACKGROUND

On the morning of January 5, 2018, Brandy Rhines was shot and killed in the kitchen of her own home. She suffered multiple gunshot wounds to the chest and head. Appellant, who was involved in a relationship with Brandy, was arrested, charged, and ultimately convicted of her murder.

### *Appellant's Relationship with Brandy*

Brandy was close friends with Natreena West, who was in a relationship with Brandy's brother, Sam. Brandy and her two children, J.R. and A.R., lived near Natreena and Sam in La Marque, Texas.  Brittany Stage-Wilson was Brandy's next-door neighbor but she did not know Brandy very well.

Brandy was involved with two men—appellant and Reginald Clark.  Brandy met Reginald in 2009, and they became romantically involved sometime after that. Reginald got married in 2013, but he and Brandy still spent time together.

---

[2]     *See* TEX. PENAL CODE §§ 19.02(c), 12.42. Trial court cause number 18CR1738 and appeal number 01-20-00769-CR.

Brandy was also in a relationship with appellant. Appellant's mother testified that the two got together while appellant was separated from his wife, but that appellant's relationship with Brandy ended when appellant's wife moved back in with him and his mother in 2017.

Appellant testified that he and his wife never broke up; she just moved out of his home to take care of her mother for a while. He claimed that his relationship with Brandy was not serious, but he admitted that he was "seeing" or "involved" with her. According to appellant, he and Brandy decided to "slow down" their relationship but he admitted that, even up to the time of her death, he and Brandy were communicating frequently. Brittany, Brandy's neighbor, saw appellant at Brandy's house occasionally, but she did not believe that appellant lived there.

Natreena and Sam both testified that appellant and Brandy were in a relationship, and it appeared to them that appellant was controlling over Brandy. Brandy did not act like herself when she was with appellant. Brandy acted nervous, irritable, and "shut off" when she was with appellant. Both Natreena and Sam testified that Brandy and appellant had ended their relationship at the time of the murder.

At a gathering of Brandy's family at which appellant was not present, Brandy's cell phone rang several times and she repeatedly hung up the phone without answering. Brandy appeared to be afraid.

3

Reginald also testified that he believed that Brandy was afraid of appellant.

*Events Before the Murder*

Reginald testified that one night in 2017, he went to Brandy's house to drink and play cards. After spending the night at Brandy's home, he went outside to leave and discovered that his tires had been slashed. Appellant testified that he did not slash Reginald's tires, but suggested that Brandy had begun seeing a third man about this time. No other witness testified about a third boyfriend.

On New Year's Eve 2018, appellant went to his aunt's house to celebrate. While there, appellant and his brother went outside to shoot guns in the air for about an hour. Appellant's brother testified that appellant's gun was a 40-calibre black and silver gun. According to appellant's brother, appellant's gun belonged to appellant's wife and appellant did not know much about guns. According to appellant's brother, appellant would not even know how to clean a gun.

In contrast, appellant testified that, even though he was a felon and was not allowed to have a gun, guns were his hobby. He learned to clean guns from watching YouTube videos, and, in fact, he had cleaned his gun on the same morning that Brandy was murdered.

Natreena testified that on New Year's Day 2018, Brandy's family gathered to celebrate. Brandy arrived before appellant, and after appellant arrived, Brandy went outside to talk to her father. While Brandy was outside, appellant got up and walked

4

to the restroom. When he got up, appellant pulled out a gun and placed it on the edge of the table and said, "This is what I'm working with." Sam took his shirt and pushed it toward the center of the table so that it would not fall. When appellant got back from the restroom, he put the gun back in his pocket and sat down. Sam said the gun was "silver chrome with a marble, white handle." Appellant denied that this event ever happened.

Appellant and Brandy left to meet his family at a nearby club. Sam asked to go with them, but appellant said that they already had plans. Appellant and Brandy left, but it did not appear that Brandy wanted to go with him.

On January 2, 2018, Brandy came over to Natreena and Sam's house and stayed well into the evening. She returned to their house the next day. She looked okay and was laughing a lot, until she got a call on her cell phone, looked at it, and her expression changed, "And it went from instant laughing to sadness." When her phone stopped ringing, Brandy left again.

Sam and Natreena last talked to Brandy on January 4, 2018, when they went to her house to pick up Brandy's children to spend the night at their house. Natreena told Brandy that if she did not feel safe alone she should go stay with her sister.

Reginald picked up Brandy on the morning of January 4, 2018, and they first went to a restaurant for breakfast and then to a hotel. While they were together, Reginald and Brandy were talking about Brandy renting some property that

belonged to Reginald's father. Reginald said that his relationship with his wife was not going well and that he would move in with Brandy. Reginald and Brandy then spent time with Brandy's sister at a restaurant in Galveston. Reginald took Brandy to a store to buy cigars and then dropped her at her home at 7:00 or 8:00 p.m.

***The Day of the Murder–Appellant's location between 6 a.m. and 9 a.m.***

Between 5:30 and 6:00 a.m. on January 5, 2018, appellant took his mother to a dialysis treatment center. His location between the hours of 6 and 9 a.m. are disputed. Appellant claimed that he was at Numbers, a game room, while the State contended that appellant drove to Brandy's house and murdered her sometime during this period.

*The State's Evidence*

Between 6:40 and 7:36 a.m., appellant called or texted Brandy 10 times. At 6:38 a.m., shortly before these calls and texts began, cell-phone-data evidence suggests that appellant was leaving his home. From 6:45 to 7:49 a.m., appellant was in an area northwest of his home. There was about a 20-minute gap in the information during which appellant may have made it as far as the Numbers game room, but the phone could not have remained in the area long because between 8:09 a.m. and 8:24 a.m. the phone moved back toward appellant's home, remaining near his home from 8:24 to 8:31 a.m. From 8:33 to 8:34 a.m., appellant's phone utilized data from a tower near Brandy's house. From 8:36 to 8:40, appellant's phone was

6

somewhat north of the crime scene, before returning to the area near his home at 8:54 a.m.

Brandy last used her phone to call Reginald at 7:44 a.m., when she told him that she had broken up with appellant.

At around 8:30 a.m., Brandy's neighbor, Brittany, saw appellant on the side of the road about a mile from Brandy's house. He was rushing back and forth to the back of his vehicle, before getting in it to leave. She saw him driving toward her neighborhood, but as she turned toward her house, he kept going. After arriving at home, she opened her windows and was going in and out of the house, but she never saw anything else.

Police believed Brandy was murdered sometime after her 7:44 a.m. phone call to Reginald and before the time that Brittany saw appellant on the side of the road around 8:30 a.m.

*Appellant's version*

Appellant testified that he took his mother to dialysis three times a week, arriving between 5:15 and 5:30 a.m. Appellant testified that, after he dropped his mother off on January 5, he went home, arriving at "about 7:00 or 6:00." He said that he often gambled at game rooms while his mother was at dialysis. He said that on the morning of January 5, 2018, he needed to be at the Numbers game room before 7:00 a.m. He testified that he then went to the Numbers game room where he

7

stayed until 7:45, when he left and went directly home. Appellant said that while he was at Numbers, he received a phone call from his wife to let him know that she was going to work. He also received a call from Brandy, which he stepped outside to take. He said that, during that call, Brandy told him that she was going to "take to it the next level" with Reginald and that he and Brandy did not fight about it.

However, the cell-phone-data evidence does not place appellant near Numbers when appellant said that these calls were made; the cell-phone-data expert testified that even though there were gaps in the data during which appellant might have traveled as far as Numbers, he could not have remained at the game room for the entire time that he claimed to have been there.

Appellant also testified that, at some point, he had to pull his vehicle over because his battery cables had come loose and had "killed [his] truck." This was at approximately the same location that Brittany Stage, appellant's neighbor, saw him in the neighborhood. Appellant denied that he was going to or leaving from Brandy's house when Stage saw him at approximately 8:30 a.m.

Appellant testified that he returned to Numbers game room, arriving there at approximately 8:30 a.m. and staying until he went to the Piggy Bank game room at approximately 9:00 a.m. Again, cell phone data does not put appellant in the vicinity of Numbers, but it does confirm that he was near the Piggy Bank game room by 9:00 a.m.

8

*The Day of the Murder—Events after the Murder*

The police obtained surveillance video confirming that appellant was at the Piggy Bank game room from 9:00 to 9:16 a.m. The cell-phone-data evidence corroborates this information. While leaving the Piggy Bank game room, surveillance video shows appellant wiping a spot over his right eye. Appellant claimed that he was not injured, but that he merely had a white discharge coming from his eye related to conjunctivitis.

At 9:31 a.m., cell-phone-data evidence placed appellant back in the vicinity of his home before showing that he moved near the vicinity of the Davita Dialysis Center. Video surveillance, and other evidence shows that appellant picked his mother up from dialysis at 10:00 a.m.. His mother testified that appellant did not have any injury to his eye when he picked her up, even though the surveillance video from Piggy Bank game room earlier showed him wiping a spot over his eye as he left the game room.

From 10:01 to 10:08 a.m., appellant was at the Dollar General Store, where he bought toilet paper for his mother. Video surveillance and cell-phone-data evidence corroborate this.

Beginning at 9:31 a.m., cell-phone-data evidence placed appellant in an area near his home. Appellant testified that, when he went home, he went to his "man cave" to clean his gun. He then went to his bedroom because he was going to take

a shower, when he heard his mother call out to him that she was hungry. Appellant testified that, as he walked down the hall to get her something to eat, he tripped on a corner of the carpet, fell, and hit his head on the handle of a pantry door. Appellant's mother also testified that she "heard this big old bloom, bloom, bloom," and when she went to the hallway to see what caused the noise, she saw appellant on the floor. Appellant's mother testified that she told him that the cut was not very deep and that he needed to put pressure on it. Appellant testified that his mother said the gash was deep. He put tissues on it to stop the bleeding, which he then flushed, which is why, he explained, that there was no blood in the house.

Appellant left the house to get band-aids. He claimed that he went to his brother's house first, but no one was there. He then decided to go to Natreena and Sam's house because he knew that Natreena had some medical experience. When Natreena answered the door, she was surprised because appellant had never been to her house without Brandy. Appellant had a fresh gash on his head that appeared to have been cleaned up because there was no dripping blood. Appellant said that he came to her house because he did not have money to go to the hospital or a clinic and that he thought that,because she had medical experience she could help.

Natreena left appellant at the door and went to get Sam. She told Sam about the gash on appellant's head and said that something was not right. When she returned, appellant had come inside her house without being invited to do so. When

10

appellant again asked Natreena to look at his cut, she told him to go to the hospital and he would receive treatment even without insurance. When Natreena asked how he cut his head, appellant said he fell at his mother's house and hit it on a hallway wall. Natreena then suggested that appellant go to the Dollar Store and get a butterfly band-aid to cover the cut. While appellant was there, Natreena noticed a gun in his pocket, but Sam did not see it.

Appellant asked Sam to come with him to the Dollar Store, but Sam declined because he was not feeling well. When appellant noticed Brandy's daughter, J.R., he said, "Hey, [J.R.], I didn't know you was here." Appellant then got in his car and drove away.

Cell-phone-data evidence and a surveillance video showed that appellant returned to the Dollar General store between 10:40 and 10:43 a.m., where he purchased bandages.

### *The Scene of the Crime*

After appellant left their home, Natreena told Sam that she had seen appellant with a gun and told him to call Brandy. Sam tried to do so, but the call went straight to voicemail. Sometime after her 7:44 a.m. call to Reginald, Brandy's phone was turned off and not connected to a network.

Natreena grabbed her keys and she, her daughter, and J.R. drove to Brandy's house. Brandy's car was in the driveway. Natreena told the girls to stay in the car

11

while she approached the house. She noticed that the front door had been kicked in. Natreena called out to Brandy but got no response. As she made her way into the home, Natreena could see Brandy's feet. Brandy's body was laying partially in the dining room and partially in the kitchen. The right side of Brandy's face had a gunshot wound, and she also had gunshot wounds to the torso. It appeared that there had been a struggle. Some chairs were turned over and a broken coffee cup was on the floor. Photographs of the crime scene show a bloodstain on the kitchen bar.

Natreena could tell that Brandy was dead, so she ran out of the house. J.R. began asking about her mother and Natreena told her not to go inside. Natreena had left her phone at home with Sam, so she asked J.R. to go borrow a phone from the mailman, who was nearby. Natreena used the mailman's phone to call police. Natreena told the 9-1-1 operator that appellant had been to her house and that Brandy was not responsive.

While she was still on the phone with the 9-1-1 operator, Natreena heard tires squealing. When she turned, she saw that it was appellant. Natreena said that appellant "jumped the curb" and parked between Natreena's car and the house. Appellant testified that he only drove to the murder scene because he saw Natreena driving nearby when he left the Dollar General Store and he thought he would ask her to put a bandage on his cut, so he followed her to Brandy's house.

12

Natreena walked toward appellant, who was asking, "What's going on? What's wrong? What happened." According to Natreena, the cut on his eyebrow was not bleeding. Natreena told appellant that the police were on the way and she said, "I know you did it." At some point, appellant asked J.R. to come to him and Natreena told J.R. not to move. The mailman got between J.R. and appellant. With police sirens approaching, appellant asked where Brandy was and ran in the house. He said that he saw Brandy's body and came back out again very quickly. He could not remember if he touched the bar while he was inside the house.

Natreena saw appellant on his cell phone; he testified that he called his mother. Appellant told Natreena, "I didn't do this. I don't know why you're trying to blame me for this." Natreena responded, "I know you did it. I know you did it." Appellant was still on the phone with his mother, and he told her that the police thought he had something to do with Brandy's murder and that they were handcuffing him.

***The Police Investigation***

Police arrived at Brandy's house at 10:49 a.m. Natreena told officers that appellant had come to her house and then to the crime scene. Natreena said that she believed appellant had murdered Brandy. She explained how appellant had come to her house earlier with a suspicious gash on his forehead.

Police entered the residence, first noting that the door had been kicked in with a lot of force. There were also signs of a struggle inside with furniture knocked over

13

and broken glass scattered. Emergency medical personnel confirmed that Brandy was dead. A subsequent autopsy showed that she died from eight gunshot wounds.

After executing a search warrant at Brandy's house, police recovered several fired 9-millimeter shell casings and bullets, all of which had been fired from the same gun. Other than an inoperable shotgun, no weapons were found in the house. There was a purse in the closet with some 9-millimeter ammunition, but it was not the same as that used in the shooting.

Police took samples from the bloodstain on the bar in Brandy's kitchen, which, when tested, revealed that the chances were one in 132 octillion more likely to be from appellant than any other contributor. Police examined the cut on appellant's eyebrow and noted that it was no longer bleeding and that there was no blood on his face or clothing. When police executed a search warrant at appellant's house, they did not find any blood on the carpet or on the pantry door on which appellant claimed to have hit his head. They did find a 45-caliber handgun and ammunition.

When police searched appellant's car, they found a box of bandages and a bloody white towel. There was also a full box of 9-millimeter ammunition in the back seat of the vehicle. No gun was found in appellant's car, and no gun was ever identified as the murder weapon.

14

Appellant's hands were tested for gunshot residue and the result showed that appellant had either fired or been in the immediate proximity of a weapon as it was fired. The gunshot residue expert testified that residue deposited on appellant's hand four or five days earlier would not still be on his hands on January 5, 2018. The expert did acknowledge that gunshot residue could be present from being at the scene of a crime (depending on how recently the gunshot particles were in the air) or if the person had recently cleaned a gun.

*Appellant's Interview*

After police read appellant his statutory rights and he waived them, he gave a statement to police. When asked when he and Brandy broke up, appellant said they were never together and that he preferred white women, like his wife. He admitted that he and Brandy had been in a sexual relationship.

He told police that Brandy had a 9-millimeter gun, but that he had never seen it. He said that his only gun was a 45-caliber handgun. When asked why he had gunshot residue on his hands, appellant explained that he had fired his gun on New Year's Eve. When informed that that was too long ago to account for the gunshot residue, appellant remembered that he had shot a racoon in his yard a day and a half before the murder. He said he had not washed his hands since then.[3]

---

[3] At trial, appellant testified that he had cleaned his gun on the morning of the murder.

15

When asked about the 9-millimeter ammunition in his car, appellant at first denied having any, but then told officers that it was from a gun that his wife used to have, which she had since pawned.

Appellant told officers that Brandy had twice called him while he was at Numbers, but that he had missed the call both times and had to call her back. He said that, during these conversations, Brandy told him that her boyfriend was angry because he knew that Brandy had been seeing someone. At one point, he suggested to police that Brandy and her boyfriend must have argued on the day of the murder. He said that Brandy had also reported to him that a vehicle had been continually driving in her neighborhood. When informed that there was no record that Brandy had called him, appellant said that he deleted her incoming calls to him but did not delete his outgoing calls to her. He also told police that he had deleted the back-and-forth texts between him and Brandy.

Appellant told police that he was bleeding when he went into Brandy's house on the morning of the murder and that his blood could be in her house. He said that he fell at his house and cut his head and that his mother could confirm that.

Appellant denied going to Brandy's house at any time that morning before Natreena discovered Brandy's body.

**SUFFICIENCY OF THE EVIDENCE**

In his fourth issue,[4] appellant contends that there was legally insufficient evidence to sustain the murder conviction and requests that the Court reverse the judgment and render a judgment of acquittal in that case.

*Standard of Review and Applicable Law*

We review the sufficiency of the evidence using the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). *See Brooks v. State*, 323 S.W.3d 893, 898–912 (Tex. Crim. App. 2010). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider all reasonable inferences that may be drawn from the evidence in making our determination, including all direct and circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

---

[4]   We begin with appellant's fourth issue in which he challenges the sufficiency of the evidence supporting his murder conviction because, if meritorious, it is the ground affording him an acquittal, the greatest possible relief. *See Davis v. State*, 413 S.W.3d 816, 820 (Tex. App.—Austin 2013, pet. ref'd) ("We begin by reviewing the sufficiency of the evidence supporting [appellant's] conviction, the appellate ground potentially affording him an acquittal, the greatest possible relief."); *Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("We address appellant's second issue first because it challenges the sufficiency of the evidence and seeks rendition of a judgment of acquittal.").

Evidence is insufficient in four circumstances: (1) no evidence exists that is probative of an element of the offense in the record; (2) only a "modicum" of evidence exists that is probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the alleged acts do not establish the criminal offense charged. *See Jackson*, 443 U.S. at 314, 320; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The jury has the exclusive role of evaluating the facts, the credibility of the witnesses, and the weight a witness's testimony should be given. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The jury may choose to believe all, some, or none of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The jury alone must reconcile any conflicts in the evidence. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).

Under the *Jackson* standard, we defer to the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. If there are conflicts in the evidence, we must presume the factfinder resolved the conflicts in favor of the verdict and defer to that determination, if it is rational to do so. *See Jackson*, 443 U.S. at 326; *Penagraph*, 623 S.W.2d at 343 ("A jury is entitled

18

to accept one version of the facts and reject another or reject any of a witness'[s] testimony."). Contradictory evidence will not diminish the legal sufficiency of the evidence that supports the verdict. *See McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970). If the evidence is insufficient, we must reverse and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41 (1982).

The standard of review is the same in both direct and circumstantial evidence cases. *See King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995); *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992). The State may prove its case by circumstantial evidence if it proves all the elements of the charged offense beyond a reasonable doubt. *See Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (citing *Jackson,* 443 U.S. at 319). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *See Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987). It is important to remember that all the evidence the jury was permitted, properly or improperly, to consider must be considered in determining the sufficiency of the evidence. *See Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *Johnson v. State,* 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.).

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1), (2). The State is required to prove beyond a reasonable doubt that the accused is the person who committed the offense charged. *See Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); *Rice v. State*, 801 S.W.2d 16, 17 (Tex. App.—Fort Worth 1990, pet. ref'd). Identity may be proved by direct or circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Greene v. State*, 124 S.W.3d 789,792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). In fact, identity may be proved by inferences. *See United States v. Quimby*, 636 F.2d 86, 90 (5th Cir. 1981). When there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the accused. *See Sepulveda v. State*, 729 S.W.2d 954, 957 (Tex. App.—Corpus Christi 1987, pet. ref'd). Proof by circumstantial evidence is not subject to a more rigorous standard than is proof by direct evidence. *See McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989). For the purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are equally probative. *See id.*

*Analysis*

Appellant argues that the evidence is legally insufficient because the cell-phone-data expert could not pinpoint appellant's location at given times and, because he did not actually "test drive" the various routes available to appellant, the expert "had no basis to opine that it would be impossible or even difficult for Appellant to have driven to 'Numbers' on the morning of January 5."[5]  Regarding appellant's blood on Brandy's kitchen bar, appellant argues that "[a] jury could only speculate as to when it was placed there, and by whom" and that "[t]he same jury might as well have speculated whether the 'smear' of blood 'found' by police 5 hours after Appellant was [in] custody was planted in order to 'bag' a known 'sex offender.'" Finally, appellant argues that there were other explanations for the gunshot residue on his hands, i.e., he handled the gun that Natreena saw him with that morning or he cleaned his gun.

While appellant seeks to parse the State's evidence and provide alternative, reasonable explanations for each piece, we note that each fact need not point directly and independently to the guilt of the appellant, if the cumulative force of all the

---

[5]  We note that the expert, in fact, testified that appellant might have been able to reach the Numbers game room, but, given other data collected, he concluded that appellant could not have remained at the game room for the entire time that appellant claimed to have been there.

21

incriminating evidence is sufficient to support the conviction. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In this case, there was evidence that appellant and Brandy were involved in a relationship in which appellant was controlling and Brandy seemed frightened of him. Though the murder weapon was never found, appellant, a felon, was seen in possession of a gun in the days before the shooting. Though appellant claimed that he did not have a 9-millimeter gun, ammunition for a 9-millimeter gun was found in his car. He also told police that Brandy had a 9-millimeter gun, which police never found. Appellant's brother testified that appellant would not know how to even clean a gun, but appellant, to explain the gunshot residue found on his hands after the shooting, claimed that his hobby was guns and that, in fact, he had cleaned his gun on the morning of the shooting. He also told police earlier that had fired a gun on New Year's Eve and that he had shot a racoon in his yard.

Appellant's alibi for the period in which police believed the shooting occurred was that he was at the Numbers game room. The cell-phone-data expert testified that, even if appellant could have reached the game room during that time, he could not have remained there for the entire period because the data placed him at other locations. In fact, cell-phone-data evidence placed appellant near Brandy's house at one point, a fact that was corroborated when Brandy's next-door-neighbor saw him on the side of the road in their neighborhood.

There were signs of a struggle at the murder scene. Furniture was overturned and glass was broken. Police discovered a bloodstain on the bar in Brandy's kitchen, which is clearly visible in photographs taken of the crime scene. DNA analysis of the bloodstain showed that chances are 1 in 132 octillion more likely that the blood came from appellant than any other contributor. While appellant attempts to suggest that his blood may have been there for a substantial period, there was also a fresh cut on appellant's forehead the morning of the murder. While appellant and his mother testified that appellant fell at his home and that perhaps his head was bleeding when he ran into Brandy's house after Natreena found her body, both Natreena and police note that appellant's head was not bleeding at that time. Appellant was seen on video wiping something off his brow at the Piggy Bank game room *before* the time that he claims that he fell and cut his head at home. No blood was recovered from appellant's home.

Natreena found it strange that, on the morning of the murder, appellant came to her house for first aid because he had never before been to her house without Brandy. Appellant also arrived at Brandy's house right after Natreena discovered her body. While appellant claimed that he saw Natreena driving toward Brandy's house and followed her there so that she could help him with his band-aid, there was also evidence that, from appellant's location at the Dollar General Store where he

23

bought band-aids, he would not have been able to see Natreena's car driving toward Brandy's house.

Finally, there was evidence that appellant called and texted Brandy multiple times the morning of her murder, and during those exchanges, Brandy told appellant that she wanted to end her relationship with him while pursuing her relationship with Reginald further. Appellant admitted that he deleted the texts between he and Brandy and that he deleted what he claims were incoming calls from Brandy.

While some evidence is circumstantial, its cumulative force provided more than a scintilla of evidence to support a reasonable conclusion that appellant shot and killed Brandy Rhines. *See Jackson*, 443 U.S. at 320 (setting forth standard for legal insufficiency). To the extent that there was any evidence suggesting otherwise, the jury had the exclusive role of weighing the evidence and the witnesses' credibility, and we will defer to their determinations as evinced by their verdict of guilt. *See id.* at 326.

Accordingly, we overrule issue four.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In issues one and two, appellant contends that he received ineffective assistance of counsel because trial counsel: (1) emphasized appellant's preference for white women over black women, (2) requested that both the weapons charge and the murder charge be tried together, (3) did not request that appellant be allowed to

stipulate to the predicate offense for the murder charge, i.e., attempted sexual assault of a juvenile, (4) failed to seek funds to hire expert witnesses, and (5) failed to subpoena an exculpatory witness.

### *Standard of Review*

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *see* TEX. CONST. art. I, § 10. To prove a claim of ineffective assistance of counsel, an appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). And, an appellant's "failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

In reviewing trial counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475,

25

482–83 (Tex. Crim. App. 2006). To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (internal quotations omitted). A legitimate and reasonable trial strategy is not ineffective assistance, even if, on hindsight, the strategy appears to have been unwise. *See Heiman v. State,* 923 S.W.2d 622, 626–27 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). That another attorney, including appellant's counsel on appeal, might have pursued a different course of action does not necessarily indicate ineffective assistance. *Johnston v. State*, 959 S.W.2d 230, 237 (Tex. App.—Dallas 1997, no pet.).

In meeting the prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. To prove prejudice, a claimant must establish a "reasonable probability" that the result of the proceeding would have been different if counsel had not been deficient. *Strickland,* 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id.* Whether there is a reasonable probability that confidence in the outcome of the trial is undermined can turn on evidence adduced at trial because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

***Reference to Victim's Race***

First, appellant claims that "[t]he emphasis placed by defense counsel on Appellant's preference for white vs. black women was inexcusable by any rationale, and [it] was unquestionably damaging."

When being questioned by police, and presumably to downplay his involvement with Brandy, a black woman, appellant told police that he had a preference for white women and would never get serious with a black woman. In cross-examining appellant, prosecutors raised this issue to have appellant to admit that Brandy was an exception to his general preference. Appellant responded that he was not serious with Brandy, "but she got closer than I would normally allow." On redirect examination, trial counsel raised the issue again, apparently to show that Brandy's being black had nothing to do with why appellant wanted to stay with his wife, and the following exchange took place:

Q: Were you married to a white woman?

A: Yes.

Q: Were you planning to leave your white wife for a black woman?

A: No, sir. Not at the time, no, sir.

Q: When you came to the time that you realized you were getting closer than you wanted it to go, what did you do?

A: I backed off.

27

Q: Did that have anything to do with whether [Brandy is] white or black or anything like that, or just the fact that you wanted to stay with your wife.

A: I wanted to stay with my wife, and other situations occurring.

Rather than a needless, uninvited mention of the decedent's race, *see Bryant v. State*, 25 S.W.3d 924, 926 (Tex. App.—Austin 2000, pet. ref'd), it seems that counsel was attempting to rehabilitate appellant on the race issue by having him testify that Brandy's race had nothing to do with why he decided to stay with his wife. As such, counsel's questioning on the issue could have been reasonable trial strategy.[6]

### *Trying the Weapons and Murder Charges Together*

Appellant also contends that he received ineffective assistance when counsel had him plead guilty to the weapons charge before the jury, thereby placing the fact that he had a previous conviction for attempted sexual assault of a child[7] before the jury the trial even began.

---

[6] We note that, at the new-trial hearing, trial counsel was not asked whether he had a strategy when he questioned appellant regarding the race issue. Thus, the record is silent on the issue and appellant has not rebutted the trial-strategy presumption on this issue. *See Menefield*, 363 S.W.3d at 592.

[7] Attempted sexual assault of a child was the predicate offense for the felon-in-possession-of-a-firearm charge, and, as such, was mentioned when the felon-in-possession-of-a-firearm charge was read to the jury before appellant pleaded guilty to it.

At the motion-for-new-trial hearing, trial counsel testified about several of the reasons he chose to have the two offenses tried together. First, counsel noted that if the offenses were tried together, the trial court could not "stack" the punishments; rather, they would run concurrently. *See* TEX. PENAL CODE § 3.03. Counsel is not ineffective for asking for a consolidated trial for this reason. *See Adekeye v. State*, 437 S.W.3d 62, 72 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Trial counsel also testified regarding his trial strategy in consolidating the cases for trial as follows:

> Q: Now, as I understand it, your theory of defense was to have Mr. Coleman plead to the weapons charge in the same trial so the jury would, in some sense, give him credit for honesty. And that would bolster his credibility with respect to denying the ultimate murder charge. Is that it?
>
> A: The answer is yes.

Counsel also testified that "the credibility of Mr. Coleman was important due to the strategy we used for his defense" and that "based on the strategy we employed, [appellant's credibility] was probably the most important [issue in the case]." Counsel testified that he "believed that those statements [to police in which appellant admitted possessing a gun] would be played to the jury. And[,] if they believed him, he needed to prove that he was being honest and credible and willing to accept responsibility for the actions he actually took." Trial counsel employed this trial strategy at closing when he argued as follows:

29

Now, we admit that having your hobby be shooting when you're not legally permitted to possess a firearm outside your home is not what we want the type of activity to condone. And I certainly understand that. And I'm not asking you to do that because [appellant] has confessed to [the felon-in-possession charge] and stands ready to accept his punishment. But importantly [appellant] thought it was so important that he assist helping finding Brandy's killer, true killer that he was willing to risk years in the penitentiary to assist the investigation. So now where is he? He's about to lose his freedom. He's lost his wife. And all he got out of this for his assistance is the right to be put on trial for murder.

The Texas Court of Criminal Appeals has held that it is a valid trial strategy to "introduce[e] favorable and unfavorable evidence in order to appear open and honest with the jury[.]" *See Ex parte West*, No. WR-78,43902, 2015 WL 9000801, at *6 (Tex. Crim. App. June 8, 2016) (mem. op., not designated for publication); *see also Varughese v. State*, 892 S.W.2d 186, 196 (Tex. App.—Fort Worth 1994, pet. ref'd) (holding that failure to object was part of strategy to appear open and honest); *Baber v. State*, 931 S.W.2d 359, 362 (Tex. App.—Amarillo 1996, pet. ref'd.) (holding "cooperative honesty" was trial strategy); *Huerta v. State*, 359 S.W.3d 887, 894 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (recognizing as permissible trial strategy decision not to object to evidence "in an effort to make appellant appear more honest and forthright"). Thus, appellant has not rebutted the presumption that counsel's decision to try the cases together was not trial strategy.

*Failing to Stipulate to Predicate Offense*

Appellant also argues that trial counsel should have requested that appellant be allowed to stipulate to the predicate offense of attempted aggravated sexual assault, while still pleading guilty to the felon-in-possession charge.  We agree that to prove the prior-felony-conviction element of the felon-in-possession charge, the State only needs to prove the defendant's status as a felon, without any need to prove the particular type of felony conviction.  *Adekeye*, 437 S.W.3d at 72; *see State v. Mason*, 980 S.W.3d 635, 641 (Tex. Crim. App. 1998). When stipulating to evidence of a defendant's prior felony, trial "[c]ousel could . . . just stipulate[] that [the defendant] was a convicted felon, without saying anything more."  *Adekeye*, 437 S.W.3d at 72.  The State responds that there was no need for counsel to stipulate to the predicate offense in this case because the trial court had already ruled that appellant could be cross-examined about that same prior conviction and "the jury was going to hear about the substance of appellant's prior conviction when he testified."

However, we need not decide whether counsel's performance in this respect was ineffective because, here, appellant has not shown that, but for the reading of the unredacted felony-in-possession charge, he would not have been found guilty of

murder.[8] *See Adekeye*, 437 S.W.3d at 73. (finding no prejudice for purposes of ineffective assistance based on stipulation informing jury of appellant's prior felony conviction for aggravated robbery when evidence of appellant's guilt for current offense of aggravated robbery and felon-in-possession was overwhelming); *see also McIlroy v. State*, 188 S.W.3d 789, 796–97 (Tex. App.—Fort Worth 2006, no pet.) (holding that, even though trial court erred in permitting State to read entire indictment of felon-in-possession charge, including predicate offense, error was harmless because of "overwhelming evidence" of defendant's guilt of current offense).

In this case too, there was strong evidence of appellant's guilt on the murder charge, as detailed in our sufficiency-of-the-evidence review above. And, although the reading of the indictment informed the jury that appellant had a prior conviction for attempted sexual assault of a juvenile, that issue was not mentioned again by either appellant or the State. Indeed, there is nothing in the record to support appellant's assertion that the jury "convict[ed] Appellant on the Murder charge for a past sex offense against a minor." Accordingly, appellant fails to meet the prejudice prong of *Strickland* on this issue.

---

[8] We need not determine the deficient-performance prong when prejudice is not also shown. *See Washington v. State*, 417 S.W.3d 713, 724 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

*Failure to Seek Funds to Hire Expert Witnesses*

At trial, the State presented evidence regarding gunshot residue found on appellant's hands after his arrest and cell-phone data reflecting the location of appellant's phone at certain periods of time. On appeal, appellant contends that counsel was ineffective for failing to seek funds to hire experts to address these two issues. Appellate counsel goes so far as to suggest that trial counsel, who was retained, only takes cases in which "he could pocket fees with relatively minimal time and effort" and that hiring an expert would go against this "business model."[9]

Regarding the gunshot-residue evidence, at the new-trial hearing, trial counsel testified that he did not call an expert on gunshot residue because he did not believe that such an expert could assist appellant's defense. Indeed, appellant's explanation for the gunshot residue on his hands was that he cleaned his gun the morning of the shooting. Trial counsel obtained testimony from the State's expert that cleaning a gun could have left the gunshot residue found on appellant's hands. Having successfully produced evidence of the limitations of gunshot-residue evidence through the cross-examination of the State's expert, appellant cannot show that counsel's performance was deficient because he did not also seek testimony from another expert testimony on the issue.

---

[9] We also address this "conflict-of-interest" issue in issue three.

Regarding the cell-phone-data evidence, trial counsel was not questioned specifically about why he did not call an expert on cell-phone-data evidence, other than a question about why he did not call any experts. The general rule is that the failure to call a witness does not constitute ineffective assistance of counsel without a showing that the witness was available to testify and that his testimony would have benefitted the defendant. *Cate v. State,* 124 S.W.3d 922, 927 (Tex. App.—Amarillo 2004, pet. ref'd) (citing *Butler v. State,* 716 S.W.2d 48, 55 (Tex. Crim. App. 1986)).

There is no showing in the record that (1) an expert was available and that (2) such testimony would have benefitted appellant. And, the record shows that trial counsel fully cross-examined the State's expert about the limitations of such evidence, with the expert admitting to the jury that the cell-phone data could not place appellant at a specific location and that the evidence could not establish that appellant never went to the Numbers game room on the day of the offense. Likewise, there is nothing in the record to show that, had appellant called an expert on cell-phone-data evidence, the result of the case would have been different.

### *Failure to Call Exculpatory Witness*

Appellant's defense at trial was that he could not have committed the offense because he was at the Numbers game room when it occurred. When police spoke with a man named Cedo, who worked at the Numbers game room, Cedo told them that appellant was present at the game room that morning. Appellant contends that

trial counsel was ineffective for failing to subpoena Cedo to testify on his behalf at trial.

When questioned about the decision not to subpoena Cedo, trial counsel explained that he had contacted Cedo "and he declined to attend." He also testified that, while Cedo's statement to police was favorable to appellant, "[i]t just didn't correspond with reality." Specifically, Cedo told police that appellant was at Numbers "all the way through 9:00 which contradicted the defendant's own timeline [of the events]." Cedo also told police that appellant was at Numbers that morning with his mother, but the undisputed evidence established that appellant's mother was at dialysis the morning of the shooting. Trial counsel concluded that, considering the contradictions between Cedo's statement to police and the established evidence, it would not have been helpful to have subpoenaed Cedo because "it could have easily been argued that Mr. Cedo was just remembering a different day [when appellant was at Numbers with his mother]." And, because one of the officers testified that Cedo told police about appellant's presence at Numbers, the substance of Cedo's statement to police was already before the jury without the necessity of subjecting him to cross-examination. Under these circumstances, appellant has not shown that trial counsel's strategy in declining to subpoena Cedo was unreasonable or that Cedo's testimony, had he been called, would have changed the result of the trial.

Accordingly, we overrule issues one and two.

**CONFLICT OF INTEREST**

In issue three, appellant contends that "[t]he totality of the record demonstrates that trial counsel labored under an internal conflict of interest, requiring a new trial as to both convictions." In his brief, appellant suggests that it was appellant's "business model" to substitute for appointed counsel, and to take those cases "with the expectation that they would not go to trial, and that he could pocket fees with relatively minimal time and effort." In support of this contention, appellant presented evidence at the new-trial hearing that, "in a two-year period, trial counsel had substituted in for appointed counsel in 118 felony cases" and that his "typical fee was $500." At the motion for new trial hearing, appellate counsel questioned trial counsel about whether he was known in the jails and prisons as the "$500 lawyer." Appellate counsel argues that trial counsel "simply under-bid" the case and that when appellant refused to plead guilty, trial counsel was acting under a conflict of interest and had a "disincentive" to vigorously defend appellant.

*Applicable Law*

The Sixth Amendment right to reasonably effective assistance of counsel includes the right to conflict-free representation. *Orgo v. State*, 557 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997) and *Goody v. State*, 433 S.W.3d 74, 79 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd)). Our standard for analyzing

claims of ineffective assistance of counsel due to a conflict of interest is well established. *Odelugo v. State*, 443 S.W.3d 131, 136 (Tex. Crim. App. 2014) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980)). To demonstrate a violation of the right to conflict free representation, a defendant must show that (1) his counsel was burdened by an actual conflict of interest and (2) the conflict actually colored counsel's actions during trial. *Id.* An "actual conflict of interest" exists if counsel is required to make a choice between advancing their client's interest in a fair trial or advancing other interests to the detriment of their client's interest. *Id.*

*Analysis*

Appellant's attempt to portray trial counsel's "business model" as creating a conflict of interest is not supported by the record. Appellant merely theorizes that the amount that trial counsel charged for the case was an "underbid" and was made with the expectation that appellant would plead guilty. However, appellant provided no evidence to support this assertion. To the contrary, trial counsel testified that he had no expectation that appellant would plead guilty, especially when appellant maintained his innocence and rejected a plea agreement, insisting that he was innocent. When appellate counsel suggested that trial counsel took cases without any investigation beforehand, trial counsel responded, "Absolutely not. That's false. Completely false. I make every due diligence effort to review exactly what's going on in the file before I make any agreement, commitment to come into any case."

The suggestion that trial counsel did not charge enough to provide effective assistance, without more, is not evidence that trial counsel was acting under an actual conflict of interest. There is no evidence that trial counsel was forced to choose between his own interests and those of appellant. *See Id.* To so hold would invite appellate courts to speculate regarding when retained counsel's fees are "high enough" to adequately represent a defendant, which we decline to do.

Here, the record shows that trial counsel provided appellant with a vigorous defense. He filed pretrial motions, engaged in plea negotiations with the State, was familiar with applicable principles of law, and actively participated in a seven-day trial, during which he extensively cross-examined the State's witnesses—including the expert witnesses. Additionally, trial counsel called six defense witnesses, including appellant and his mother, and presented evidence to support appellant's alibi defense. We have already held that trial counsel did not provide ineffective assistance for the reasons urged by appellant in issues one and two. Thus, even if we were to agree that counsel was burdened by an actual conflict of interest, which we do not, there is nothing to show that the conflict colored counsel's actions during trial. *See id.*

Accordingly, we overrule issue three.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Countiss and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).